**ROSENBERG et al. v. CARR FASTENER CO.**

No. 412.

Circuit Court of Appeals, Second Circuit.

July 21, 1931.

Clarence M. Crews, of New York City, Edgar M. Kitchin, of Washington, D. C., and David L. Podell, Edmund Quincy Moses, and Jacob J. Podell, all of New York City, of counsel), for appellants.

Emery, Booth, Varney & Whittemore, of New York City (Preston Upham and L. G. Miller, both of Boston, Mass., of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is the usual patent suit for infringement of letters patent Nos. 1,299,232, 1,411,-184, and 1,465,148, granted by the United

States to Heyman Rosenberg. The suit is by the patentee and Parker-Kalon Corporation, an exclusive licensee. Infringement was admitted by the defendant. The trial court dismissed the bill as to all three patents for invalidity.

The patents relate to improvements in the art of fastening together sheets of metal with screws.

Patent No. 1,299,232, granted upon an application filed April 16, 1917, is for the process.

Patent No. 1,411,184, granted upon an application filed April 16, 1917, is for the metallic structure.

Patent No. 1,465,148, granted upon an application filed January 18, 1917, is for the screw designed for insertion in the sheets of metal or other material.

Rosenberg, the inventor, testified that, in order to get away from the expensive mode of joining strips of metal by inserting bolts through drilled holes and heading the bolts with nuts, he tried the method of punching a hole in the strips and then screwing down ordinary screws to hold them together. This, he said, he did in 1905 or 1906. He found that it did not work and the fastenings got loose because the upper parts of the screws just under the heads were not threaded. Thereafter he used screws threaded all the way to their heads, but still found that they worked loose in time. Finally, in 1913, he adopted the plan of hardening the teeth on the screws so that they would not wear down when being inserted in the metal or break down under subsequent vibrations or other strains. In the early years of his experimentation he says that he used tapering screws. These did not work out well, for it took too much power to screw them in, and beside they would "throw the burr away," and, under vibration, would come loose. He supplanted them in 1913 by screws of the type of the ordinary wood screw which Professor Rautenstrach, of Columbia, defined as "a screw with a cylindrical body and a tapering point." The result was that a screw such as Rosenberg used, for which a proper hole had been punched, would stand up for a long time against heavy strains, and the screws and strips of metal in which they were inserted had a great commercial success. Rosenberg also laid great stress in his testimony on the kind of punch which he used and the cylindrical hole which was bored in the sheets of metal for the insertion of the screw. He at first used a tapered punch and left it to the individual workman

to determine how far to insert it and thus how large a hole to make in each case. This resulted in lack of adaptation of the hole to the screw. He accordingly standardized his tools so as to have punches of the size required for the particular screws to be used, with a stop shoulder to limit the extent of the insertion and of equal diameter for the whole length of each punch except at the point. These stop punches have been used from 1917 on, but customers are still told that they can use a tapering punch if they prefer.

The gist of Rosenberg's invention in all his patents was a cylindrical screw having a hardened thread and threaded the entire length.

On November 11, 1913, Rosenberg had filed an application in the Patent Office for an improved screw for screwing sheet metal structures together. He said that "to secure two or more sections of pipe or ducts or any other elements" he first punched a hole with the end of the screw slightly smaller than the body of the screw to be used. He then inserted the screw and turned it, the screw cutting its own thread or acting as a tap as it turned and passed through the punch opening; that the screw should be "made of steel and properly tempered" so that it would readily cut a thread in the pipes or ducts which are usually made of relatively soft material, such as iron. He added that, in order that the screw should "not back off," he made the shank straight and tapered the point; the thread extending through the length of the shank and around the tapered end which acted to start the thread in the punched opening. In order further to prevent the screw from backing off, he stated that he "preferably" formed teeth or serrations on the under surface of the head which would eat into the middle of the element to which the screw was applied and lock the screw and thus prevent it from turning after it had been forced home. The original application contained five claims. The first claim was for "a screw, consisting of a straight shank, having a tapered end, a head, and a thread extending through the entire length of the shank and tapered end." All of the other claims, though varying slightly from one another, provided as an additional element for "projections on the under surface of the head."

The claims were rejected by the Commissioner on the prior art in a letter under date of March 12, 1914, to Morris Block, the then attorney for Rosenberg who had filed the usual power of attorney from the latter in accordance with the regulations.

Nothing further was done upon this application until April 6, 1917, when Edgar M. Kitchin, Rosenberg's new attorney, filed a petition in the Patent Office requesting that the old application be revived, that the claims be canceled, and two new claims be inserted. This petition was accompanied by an affidavit of Rosenberg in which he stated that the five original claims did not cover the substance of his invention and that he did not learn that it had become abandoned for lack of prosecution until on or about March 28, 1917, when his former attorney, Morris Block, so informed him. The new proposed claims did not mention such an element as "projections on the under surface of the head" which had been found impracticable and were substantially like rejected claim 1 except that they provided for a "hardened" thread instead of leaving this to be read into the claims from the words in the specification "made of steel and properly tempered." The Commissioner, in a letter dated April 27, 1917, denied the petition to revive "without prejudice," whereupon two years later, on May 24, 1919, a further petition to revive was filed. That petition attempted to excuse delay in the prosecution of the former application because of the misunderstanding of the application by the former attorney, applicant's own ignorance that certain features of his invention had been disclosed in 1913 in a printed publication, and his belief that he had adequate protection by reason of certain other applications then pending before the Patent Office, on one of which patent No. 1,299,232 had been granted. This petition to revive was denied by the Department after a rehearing on the ground that the showing did not establish that the delay between April 27, 1917, and the new petition of May 29, 1919, was unavoidable.

Under Rev. St. § 4886 (35 USCA § 31) a patent is absolutely barred if the subject-matter of the invention was described in a printed publication or was used or sold in this country more than two years before the application was filed. The applications for the patents in suit were filed in 1917, and the Parker Supply Company, of which Rosenberg was an officer, was advertising the screws in 1913 and 1914, which he sought to patent in his abandoned application of November 11, 1913. Goldberg testified that he had personally prepared the advertisements in trade papers for the Parker Supply Company, and that the company had sold several thousand in 1913. This was all more than two years before the applications for the pat-

ents in suit were filed. Therefore these patents are barred so far as they related to articles described, used, and sold in 1913 and 1914, unless Rosenberg's original application of November 11, 1913, was not in law abandoned.

The complainants seek to avoid the prior publication, use, and sale by treating Rosenberg's old application as still alive. But Rev. St. § 4894, as amended, provides that "all applications for patents shall be completed and prepared for examination within one year after the filing of the application, and in default thereof, or upon failure of the applicant to prosecute the same within one year after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable. * * *" Title 35, U. S. Code, § 37 (35 USCA § 37).

If the notice of the rejection of the claims of the original application was properly given (a matter which we shall discuss later), we feel no doubt that the Commissioner acted within his rights in declining to revive the application. The attorney Block, who evidently lost faith in the invention, regarded the application as hopeless, and did nothing for three years after the last action therein. The next attorney likewise failed to renew his petition to revive for two years after the first was denied "without prejudice." If this was not an abandonment, it would be hard to know what would be one. Certainly we cannot say that when the Commissioner was not satisfied that the "delay was unavoidable" he exercised his jurisdiction in a capricious or arbitrary manner. Hayes-Young Tie Plate Co. v. St. Louis Transit Co. (C. C. A.) 137 F. 80, 82; Martin v. Robertson, 59 App. D. C. 270, 39 F.(2d) 520.

In Hayes-Young Tie Plate Co. v. St. Louis Transit Co., supra, Judge Sanborn said: "The abandonment of an application destroys the continuity of the solicitation of the patent. After abandonment a subsequent application institutes a new and independent proceeding, and the two years' public use or sale which may invalidate the patent issued upon it must be counted from the filing of the later application." See, also, Diamond Power, etc., Co. v. Bayer Co. (C. C. A.) 13 F.(2d) 337, 340, and Lay v. Indianapolis, etc., Co. (C. C. A.) 120 F. 831, 836.

There can be no doubt that, if the old application was abandoned, it cannot be treated as copending with the applications of

the patents in suit so as to date back those applications to November 11, 1913, under the familiar rule (Victor Talking Mach. Co. v. American Graphophone Co. [C. C. A.] 145 F. 350; General Electric Co. v. Independent Lamp & Wire Co. [D. C.] 267 F. 824, at page 836), and thus to obviate the bar of the publications and sales in 1913 and 1914.

It is admitted that, if the application of November 11, 1913, is abandoned the claims relied on are barred by publication, prior sale and use in 1913, with the exception of claim 7 of patent No. 1,299,232, and claims 3 and 5 of patent No. 1,411,184. The question, therefore, arises whether the notice of rejected claims given to Block in the letter of March 12, 1914, was sufficient to work an abandonment in view of the subsequent delay in prosecuting the application.

Notice of the last action of the Patent Office upon the application was given by letter dated March 12, 1914, from the Examiner to Block, in which the last claims of the application were rejected. Block had been appointed attorney by Rosenberg under a power filed November 11, 1913, authorizing him "to prosecute this application, to make alterations and amendments therein, to receive the patent, and to transact all business in the Patent Office connected therewith." Certainly such broad powers, relating to matters of an occult art abounding in mysteries, would seem to involve the right to determine whether to file further claims or take other additional action or to take no action. Block thought that nothing more could be done, and did nothing. The consequence of inaction persisting for a year after the rejection was constructive abandonment by virtue of Rev. St. § 4894, for that section specifies that such shall be the result where nothing is done for that period of time.

Appellants say that this cannot be so, because section 4894 provides for "notice * * * to the applicant" in such cases, and makes no mention of his attorney or agent. But Rev. St. § 4903 (35 USCA § 51), also provides for notice to "the applicant" of a rejected claim with the reasons for such rejection, and for the greater part of a century notices of rejection and of similar matters have been given to the attorney for the applicant and all correspondence had with him. The language of section 4903 as to notice was taken directly from section 7 of the act of 1836 codifying the Patent Act (5 Stat. 120, § 7). In the Office Regulations of 1849 the statement appears that "no double correspondence can be sanctioned. When an inventor employs an agent, the office will correspond with either, but not with both." Likewise under the Rules of March 1, 1853, section II, there was the regulation that, "where an agent has filed his power of attorney, duly executed, the correspondence will, in ordinary cases be held with him only. * * * If the principal becomes dissatisfied he must revoke his power of attorney."

This rule continued in substance from those early days, and we find practically the same language now in rule 7 of the Patent Office.

It is true that the portion of section 4894 relating to giving notice as a condition of treating an application as abandoned was not enacted until 1870, but as soon as it was enacted a series of rules went into effect culminating in present rule 31, which prescribed notice to the applicant "or his agent."

Thus there has been such a continuous departmental interpretation of the words "notice to the applicant" by the rules of the Patent Office as to leave no doubt that notice to an "applicant" under the practice of the Patent Office is satisfied by notice to his attorney.

When Congress codified the patent laws in 1870 and introduced the subject-matter relating to abandonment for failure to reply to office action, it adopted the well-understood language of the act of 1836 and used the words "notice to the applicant" in their long-settled meaning. In rules 7 and 39 of August 1, 1871, the Patent Office prescribed that such notices might be given to the applicant "or his agent." When Congress repealed the codification of the patent laws of 1870 by Rev. St. § 5596, it re-enacted them in the Revised Statutes of 1874, and in doing so necessarily adopted the administrative interpretation. The word "applicant" naturally includes an authorized agent, but, even if its meaning were ambiguous, the settled administrative definition would determine its legal effect. Brewster v. Gage, 280 U. S. 327, at page 337, 50 S. Ct. 115, 74 L. Ed. 457. Edwards v. Wabash Ry. Co. (C. C. A.) 264 F. 610.

Moreover, in Ex parte Murray, 1891 C. D. 130, a notice of rejection of certain claims was mailed to the applicant in care of his attorneys, who failed to notify him of the rejection. No further prosecution of the application occurred for more than two years. In these circumstances the Commissioner held that neither the failure of the applicant's attorneys to notify him of his rights, nor the alleged neglect on their part to pros-

ecute the case, rendered the delay unavoidable. He said: "It is a general rule of law that a party is bound by the deliberate acts of his attorney acting in good faith and within the scope of his authority. If then the neglect or omission of the attorneys to take an appeal is that of the applicant by construction, the delay was not unavoidable." See, also, In re Mattullath, 38 App. D. C. 497.

Ex parte Gourtoff, 1924 C. D. 153, cited by appellants, has no bearing on the present case. There the notice under section 4894, relied on to work an abandonment, never reached either the applicant or his attorney. The decision involved only the conclusion that it must in fact do this. In Ex parte Lasscell, 1884 C. D. 42, it was held that an attorney was without power to cancel all the claims in an application and thus to work an abandonment where the rule of the Department required a declaration of abandonment to be signed by the applicant. There is a distinct difference between the failure of an attorney to prosecute where the management of the prosecution is wholly intrusted to him and his affirmative act in canceling claims which is equivalent to a formal abandonment that can only be effected by the applicant. He may know of no justifiable way to prosecute further. Such nonfeasance is not equivalent to affirmative action, though each may involve the same consequence.

Appellants argue that Rev. St. §§ 4885 and 4897 (35 USCA §§ 38, 41), show that, where Congress intended to allow notice to an attorney, it has said so. These sections relate to fees for issuing patents and provide that an applicant who fails to make payment within six months from the time a patent has been allowed "and notice thereof was sent to the applicant or his agent" shall not have the right to obtain the patent or to make an application for the invention covered by the original application. Rev. St. § 4885, providing for notice "sent to the applicant or his agent" originated in the Patent Act of 1863, 12 Stat. 796, § 3. Rev. St. § 4897, originated in the Patent Act of 1864, 13 Stat. 194. But the language of sections 4903 and 4894 originated in 1836, and has since that time been continuous in the law regarding notification of the applicant of rejections by the Patent Office. As we have already said, it was copied in the codification of 1870, while the language of sections 4885 and 4897 originated in separate acts of 1863 and 1864, and was copied in the codification. Even if this were not so, it cannot be said that

because sections 4885 and 4897 explicitly provide that notice must be given to the applicant, or his agent, another section must be changed from its long-settled meaning to include personal notice. The continuous interpretation of section 4894 as allowing notice to an agent is not, in our opinion, negatived by the different language of the fee statute.

■ As a result of the foregoing we hold the patents in suit barred by prior publication, sale, and use as to all matters not embraced in claim 7 of patent No. 1,299,232 and claims 3 and 5 of patent No. 1,411,184. This is because all other claims involved are completely within the prior publications and sales testified to by Goldberg. They merely followed the disclosure of Rosenberg's application of November 11, 1913.

We need not say whether the old art of inserting a screw of proper temper threaded to the head in a metal sheet, in order to fasten it, shown by British patent No. 17,477, A. D. 1895, to Williams left anything for Rosenberg to invent. Indeed, the Williams patent was a complete anticipation of everything of value disclosed in Rosenberg's original application, unless the slight taper shown in the illustration of the Williams screw differentiates it. But, irrespective of this, the advertisement in the November, 1913, edition of Sheet Metal, and in subsequent publications which were prepared by Goldberg, precludes any broad claims of Rosenberg's invention, mentioning, as it does, even his "process of hardening," and the sales by the Parker Supply Company in 1913 and 1914 have the same effect.

■ The question remains whether there is any patentable improvement covered by claim 7 of patent No. 1,299,232 or claims 3 and 5 of patent No. 1,411,184. Appellants' brief indicates that the stop punch and a cylindrical hole for the insertion of the screw are the novel features added by these claims to the invention of 1913.

The process patent No. 1,299,232 mentions and illustrates a stop punch to make the hole in overlapping sheets of metal. The stop punch is neither patented nor called for by the claims. But the words "forming an entering opening" are used in claim 7. The entering might, however, be formed either by a stop punch or a tapered punch, or by driving in the pointed end of the screw, as seems to have been the method suggested in the abandoned application. Claim 7 says that the "entering opening" shall be of "no greater diameter than the body of the screw."

That the hole should be small enough to allow the hardened threads to cut the metal as deeply as possible is wise enough, but hardly requires inventive thought.

In patent No. 1,411,184 the specification mentions and illustrates a stop punch as a suitable tool to make the hole for the screw. Claim 3 calls for an opening, the wall of which is "substantially cylindrical, throughout that portion extending through the material of the sheets themselves," but what originality can there be in having an opening "substantially cylindrical"? Any round punch would make it, and such punches are as old as the hills. While the hole made is in a geometric sense frusto-conical, and not cylindrical, it probably is "substantially cylindrical" in the ordinary meaning of the words. Claim 5 calls for "an entering opening of a diameter less than the greatest distance between substantially diametrically opposite points of the larger portion of the thread." This inevitable requirement phrased in the complicated jargon of the file wrapper is certainly neither original nor illuminating. It is that a hole for the insertion of a screw must not be so large that the screw will drop through it and thus fail to cut the metal in which it is to be anchored.

The patentee evidently hoped that he would meet no prior publications or prior uses. He accordingly inserted in claim 2 and other claims of the above patents only the disclosure of his invention of 1913. But in claim 7 of Patent No. 1,299,232 and claims 3 and 5 of Patent No. 1,411,184, he added elements of the most obvious kind which he now grasps *"in naufragio"* as the last chance to save his venture.

A stop punch of uniform diameter may be a good thing, and so would be a drill of constant diameter. Each will prevent possible variations in the size of the opening. If a workman had training and skill enough not to insert a tapered punch, either too far or not far enough, he would save his employer the trouble of furnishing a variety of stop punches to fit screws of different sizes. Some workmen may be skillful enough to work with tapered punches and produce the very best results. But it seems unreasonable to say that the use of either type involves invention. An opening "substantially cylindrical" may be a wise choice, but such an opening seems to us almost inevitable. It is a tribute to the old maxim that "a round peg doesn't fit a square hole," rather than to inventive genius. Such trivial modifications of a process or product otherwise unpatentable do not show invention. Very recent decisions of the Supreme Court indicate that a substantial step beyond the prior art must be taken in order to support a valid patent. Here the advance over the invention of 1913, if it be thought to have occurred, was altogether too slight and obvious. De Forest Radio Co. v. General Electric Co., 51 S. Ct. 563, 75 L. Ed. 1339, decided May 25, 1931; Carbice Corporation v. American Patents Development Corporation, 51 S. Ct. 496, 75 L. Ed. 819, decided May 18, 1931; American Fruit Growers, Inc., v. Brogdex Co., 283 U. S. 1, 51 S. Ct. 328, 75 L. Ed. 801; Smith v. Springdale Amusement Park, Ltd., 283 U. S. 121, 51 S. Ct. 368, 75 L. Ed. 878.

The decree is affirmed.