**ROSENBERG et al. v. JOHN HASSALL, Inc.**

No. 6985.

District Court, E. D. New York.

Feb. 6, 1934.

Clarence M. Crews, of New York City (Edgar M. Kitchin, of Washington, D. C., of counsel), for plaintiffs.

Mock & Blum, of New York City, for defendant.

GALSTON, District Judge.

This is a patent infringement suit involving the validity and the infringement of patent No. 1,482,151 granted January 29, 1924, to H. Rosenberg for a metallic fastener.

The device of the patent is a screw type of fastener for securing metal plates together with such an interlocking of the engaged parts as to resist removal of the screw.

The screw is a cylindrical body having multiple, high-pitched threads, with a head at its upper end. The threads extend angularly only a comparatively slight distance about the body of the pin or screw. The cylindrical part extends beyond the threads in the form of a smooth portion designated in the specification as a guide or pilot. The pilot is of slightly greater diameter than the diameter of the screw measured at the valleys which appear between the threads, thus forming a shoulder at its upper end.

The threads are of hardened material so that they may cut their way, without damage to themselves, into or through the plates through which the screw is passed. For convenience of manufacture, the pin may be of case-hardened iron or steel.

In operation, the pin is placed in position with the pilot extending into a bore formed in one of the plates. The head of the pin is then struck by a hammer or other suitable implement. In the course of this driving action, the metal into which the pin is driven is somewhat severed by the cutting threads and caused to flow at the opposite sides of the threads into the valleys between them and to a position overhanging the shouldered portion of the pilot. This effects a lock. The inventor notes in his specification that as the pin is driven it is somewhat rotated, and consequently acts as a screw as well as a rivet.

Claims 5, 6, 8, and 9 are in issue. It will be sufficient to discuss claims 5 and 9. They read:

"5. A fastener for metal work comprising a pin-like body having hardened threads of sufficiently high pitch to permit the driving of the body into an opening in metal of a transverse area less than a circle described about and touching the exposed edges of the

threads, and sufficiently low to effect rotary movement of the body incident to the action of the threads engaging the metal when the body is being driven into such opening, there being a sufficient number of threads to cause each of the threads to occupy substantially as much space as the space between any two consecutive threads for causing a clogging action between the threads by the metal·engaged thereby when the pin is subjected to a withdrawing stress after being driven into such opening."

"9. A fastener for metal work comprising a pin having a substantially cylindrical body and hardened threads extending along the pin and of sufficiently high pitch to allow the pin to be driven into an opening in metal of substantially the same diameter as the body, a portion of the body extending beyond one terminus of the threads for forming a pilot."

Hardening a metal screw was, of course, not new when Rosenberg filed his application for the patent in suit on September 24, 1921. Indeed, in an application which he filed for another patent on November 11, 1913, as appears from the opinion in Rosenberg et al. v. Carr Fastener Company (C. C. A.) 51 F.(2d) 1014, he specified that the screws should be "made of steel and properly tempered." From the same case it appears that on April 6, 1917, he filed another application providing for "hardened" threads. Consequently, the hardening feature must be disregarded as any evidence of invention.

Indeed, the prior art, other than Rosenberg's own use, discloses a hardened screw, as, for example, United States patent to Whitney, No. 107,143, issued September 6, 1870.

So, too, the defendant previous to September 24, 1921, manufactured drive screws, Defendant's Exhibit I, made from basic rivet wire, and, while not case-hardened, they were hardened by rolling. Also they were provided with multiple threads, four or five to each screw. These screws were normally driven into the material, and would turn as they were thus driven. It may be noted, too, that this early specimen of defendant's manufacture in respect to the relation between the width of the thread at its base and the width of the space between the two threads is essentially the same as that shown in the devices of the defendant alleged to be infringed.

We come then to the question, whether changing the pitch of the thread, which is apparently the only feature which distinguishes Rosenberg's present invention, (as at least defined in claims 5, 6, and 8) from his prior patents, constitutes invention.

A multiple pitch in a screw is not new. United States patent No. 2,417 issued to W. T. Steiger on January 8, 1842. This patent shows multiple threads, and though, of course, the Patent Office drawings are not working drawings, and though the patent says nothing concerning the degree of the pitch, apparently the models offered by the defendant are fair representations of the Steiger device, and they are of a sufficiently high pitch to function as drive screws, providing the material into which the screws are driven is softer than the screws. It follows that, if these multiple threaded screws were hardened, as the art taught, they would function exactly as the screws defined in claims 5, 6, and 8 in issue.

But it is urged by the plaintiff that the patentee was the first to provide a fastener which could be hammer driven into iron or steel. It is contended that this fastener can be driven into a block of iron with the same facility with which a nail is driven into a board, and that no other fastener, except a rivet, was known which would afford the capacity to resist vibration and withdrawal stresses comparable to the capacity of the fastener of the patent in suit.

But Rosenberg admitted that he had placed on the market the screw marked A, of Plaintiff's Exhibit No. 14, in 1913, and that it had a case-hardened thread; and, in the plaintiff's catalogue of this type of screw, there is set forth a statement that such screw holds in place even when there is vibration, and that, when it is driven into metal, the threads cut into the metal, that the metal firmly anchors against the screw by flowing between the threads, and that the screw is thus firmly held in position. It is true that this type of screw is used only for thin sheets and is applied with a screwdriver.

But the catalogue recites conditions of a vibration test on such screw, which suggests that it could be hammer driven:

"The specimen was secured at both ends in the vibration machine * * * so as to permit free motion in a horizontal plane. Vibration was induced by the impact of a hammer arm raised and lowered by a motor-driven cam at the rate of approximately 600 blows per minute. During the period of the test the specimen was struck 1,839,000 times, yet not a single Self-tapping Screw loosened. * * * *"

Professor Rautenstrauch, plaintiff's expert, admitted that, if a screw, such as Defendant's Exhibit A, were given a high pitch, it would be classified as a drive screw instead of a wood screw. The fair inference is that the only difference between a wood screw, which is turned, and a drive screw, which is hammered, is in the pitch of the threads. He admitted that, to make a drive screw according to Exhibit A, it would be necessary only to take the rolling dies and to arrange them at a different angle; and that such rolling process had been known for at least twenty or thirty years.

Rautenstrauch also testified: "XQ115. Except for the hardening of the thread what difference is there for example between the drive screws which are shown in the lower lefthand corner exemplifying defendant's product and the drive screws in the United States prior to 1920? A. First, the difference in the depth of the threads, but the prime difference is in the hardening of the thread."

As to drive screws, they certainly were known as early as 1911, as is indicated in the "Engineering" drawing published in 1911. This publication also teaches that a drive screw should have a high pitch.

In Knight's "American Mechanical Dictionary" published in 1877, illustrating various forms of screws and screw threads, threads are shown which disclose that the relation between the width of the thread at its base and the width of the distance between adjacent threads are approximately equal.

If, then, the advantages that the patentee contends for are conceded, we may then inquire to what novelty in the invention they are attributable. Certainly, it is not the hardening of the screw threads, for that is old. Likewise it is not a multiple thread, because that also is old.

Is there anything, then, that the patent teaches which was not taught in the prior art? It may be conceded that the cited prior art makes no mention of the advantage of the high pitch. Rosenberg, apparently, was the first to say: "It is not essential that the exact pitch of the threads shown in the drawings be adhered to. The pitch may be increased or decreased so long as kept within the limits represented on the one hand by being low enough to cause the drive screw or pin to turn when the pin is being driven in, and to also effect the required hold on the material engaged by the screw, and represented on the other hand by being high enough to permit the screw to be driven into an opening in metal of a diameter substantially equal to the diameter of the body of the screw while the threads enter the metal surrounding the opening. The number of threads employed is also susceptible of variation, but should be great enough to insure clogging of engaged metal between the threads when the screw is subjected to a withdrawing stress."

And he adds: "While the parts indicated by the reference numeral 2 have been referred to as 'threads' in view of their angularity and their resultant functioning at times in a manner somewhat similar to a screw thread of high pitch, the said parts are obviously ribs with valleys between, and the parts are so proportioned that the distance between the bases of any two diametrically opposite valleys is less than the diameter of the pilot 4."

Clearly, however, if the prior art disclosed a device in which the pitch of the fastener was within the limits set forth in the specification of the patent, Rosenberg's appreciation of the advantages of such construction would not constitute invention.

Indeed, it is the contention of the defendant that the inventor himself did not specify a fastener in which the parts "are so proportioned that the distance between the bases of any two diametrically opposite valleys is less than the diameter of the pilot 4," except as an afterthought; and that such limitation as was made on November 15, 1923, to the claims then numbered 9 and 14 was no part of the original invention, but resulted because of the citation by the Patent Office Examiner of the Van Stone patent, No. 186,904.

The defendant contends that nothing was said in the original specification about the relation between any two consecutive threads and the space occupied by one thread; and that the drawings do not disclose that feature.

Also it is said that the amendment filed on August 29, 1923, which included the provision that "The number of threads employed is also susceptible of variation, but should be great enough to insure clogging of engaged metal between the threads when the screw is subjected to a withdrawing stress," is not supported by the original specification, though claims 5, 6, and 8 depend upon that amendment.

I am inclined to believe that the contentions of the defendant in respect to the scope of the invention, as presented in the application as originally filed, are sound. However, even if they were not, it is not easy to

find, and I do not find, any such departure from or contribution to the prior art as warrants the holding of invention.

In Rosenberg et al. v. Carr Fastener Co. (C. C. A.) 51 F.(2d) 1014, 1018, heretofore cited, Judge Augustus N. Hand wrote: "We need not say whether the old art of inserting a screw of proper temper threaded to the head in a metal sheet, in order to fasten it, shown by British patent No. 17,477, A. D. 1895, to Williams left anything for Rosenberg to invent. Indeed, the Williams patent was a complete anticipation of everything of value disclosed in Rosenberg's original application, unless the slight taper shown in the illustration of the Williams screw differentiates it. But, irrespective of this, the advertisement in the November, 1913, edition of Sheet Metal, and in subsequent publications which were prepared by Goldberg, precludes any broad claims of Rosenberg's invention, mentioning as it does, even his 'process of hardening,' and the sales by the Parker Supply Company in 1913 and 1914 have the same effect."

And Judge Hand added: "Such trivial modifications of a process or product otherwise unpatentable do not show invention. Very recent decisions of the Supreme Court indicate that a substantial step beyond the prior art must be taken in order to support a valid patent. Here the advance over the invention of 1913, if it be thought to have occurred, was altogether too slight and obvious. DeForest Radio Co. v. General Electric Co. [283 U. S. 664], 51 S. Ct. 563, 75 L. Ed. 1339, decided May 25, 1931; Carbice Corporation v. American Patents Development Corporation [283 U. S. 420], 51 S. Ct. 496, 75 L. Ed. 1153, decided May 18, 1931; American Fruit Growers, Inc., v. Brogdex Co., 283 U. S. 1, 51 S. Ct. 328, 75 L. Ed. 801; Smith v. Springdale Amusement Park, Ltd., 283 U. S. 121, 51 S. Ct. 368, 75 L. Ed. 878."

For the foregoing reasons I believe claims 5, 6, and 8 are void for want of invention.

As to claim 9, it includes the pilot. Only one of defendant's products (No. 1 of Plaintiff's Exhibit 2) has a pilot. It may be noted that the claim makes no limitation of the kind of pilot.

This element of the claim is shown in the patent to Bray, No. 289,333, granted November 27, 1883. It is for a drive screw and shows a cylindrical part g. The specification states: "Between the base of the point and the commencement of the thread c is a cylindrical part, g, which is of the same diameter as the base of the point. This part g forms a guide or leading-point in driving the screw, causing it to align perfectly when driven into a previously-bored hole."

Defendant's Exhibit A likewise has a pilot, and to all intents and purposes would function in the same way as the device of the patent in suit.

Professer Rautenstrauch, in respect to the pilot, admitted: "Q44. And the fastener therefore would function the same in principle with or without the pilot? A. As far as its binding action is concerned I think so."

I think, therefore, that the addition of the element, referred to as the pilot, to the combination of the claims, did not constitute invention; and I accordingly conclude that claim 9 is also void.

Defendant may have a decree dismissing the complaint.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.