## ROSENBERG et al. v. SHAKEPROOF LOCK WASHER CO.

No. 966.

District Court, D. Delaware.

Aug. 13, 1937.

Hugh M. Morris, of Wilmington, Del., Clifton V. Edwards and Reverdy Johnson (of Edwards, Bower & Pool), all of New York City, for plaintiffs.

Thomas G. Haight (of Wall, Haight, Carey & Hartpence), of Jersey City, N. J., Robert W. Byerly, of New York City, Roy H. Olson (of Cox and Moore), of Chicago, Ill., and Ralph M. Watson, of New York City, for defendant.

NIELDS, District Judge.

This is a patent infringement suit of Heyman Rosenberg, patentee, and Parker-Kalon Company, exclusive licensee, against Shakeproof Lock Washer Company, defendant. The bill of complaint charges defendant with infringing patent No. 1,-809,758, granted June 9, 1931, for "Fastener" with all the claims in issue, and patent No. 1,827,615, granted October 13, 1931, for "Fastener" with claims 1, 2, 4, and 5 in issue. The bill further charges defendant with infringing the trade-mark "Self-tapping" of plaintiff. The defenses are invalidity and noninfringement.

Both patents relate to the type of screw employed for fastening sheets of metal together. After a hole has been bored to aid the screw in penetrating the metal, the screw wedges its way into the metal.

### History of the Art.

Screws have been used for centuries. Their design and manufacture were well understood. Thread rolling was the most economical form of screw manufacture. Pointed screws rolled on curved dies were threaded to the end of the taper. A curved die fits a tapered blank. As you push the blank in you force the material into the grooves of the die. The height of the threads depends upon the depth of the grooves of the die. This is the usual and very old way of making screws.

Blunt screws with tapering ends were frequently rolled on straight dies. This method of manufacture left the thread at the end incomplete and somewhat grooved. It is grooved because the action of the metal is to run up the sides of the grooves of the die and to leave a groove in the partially-formed thread of the screw.

White, the manager of an old screw company in Connecticut, deposed that when a tapered screw was ordered it was rolled on a straight die and the end was grooved. It was done without any intention of making a groove. The customer did not order the groove, but got it. The customer did not recognize any advantage in the groove because there was none. It was the economical and standard mode of manufacture. The testimony of Cherry, another manufacturer, was to the same effect.

Before 1913, two types of screws were prevalent; the machine screw and the wood screw. The machine screw was made of metal with the threads close together. In using this screw the prevailing practice was: (1) To bore a hole into the work; (2) to thread the hole with a tap; (3) to insert the screw in the threaded hole and to screw tightly. The pressure could be increased by a nut applied to the projecting end. The wood screw was made of metal with the threads spaced some distance apart. It had a gimlet point so that it could be screwed directly into the wood; hence its name. Screws intended to go into wood without boring a hole had abrupt tapers. Screws intended to go into preformed holes had gradual tapers which kept them from canting.

In 1913, Rosenberg, the patentee in this case, applied for a patent on a screw herein called the A type screw. His patent solicitor allowed the application to lapse and it became abandoned. Three other applications were filed after the screw had been on the market. One application covered the screw. Another covered two pieces of metal fastened with the screw. The third application covered the method of putting it on. Patents issued before were held invalid because of the prior use by the inventor. Rosenberg v. Carr Fastener Co. (C.C.A.) 51 F.(2d) 1014. These patents involved the question whether it was invention to harden an old screw. All that Rosenberg did was to harden the threads of the old wood screw. When the patents were held invalid their subject-matter was disclaimed to the public. The public acquired the right to use a screw with hardened threads to crowd the metal out of the way and to embed the threads in the metal with the incidental advantage of holding under vibration. The public, of course, had and still has the right to make screws the way they have been made for years. This A type screw became and remains a part of the prior art.

A condensed statement with drawings may indicate the relation of the old screws of the prior art to the screws of plaintiff and the screws of defendant.

It appears that 3 or ¨A¨ type screw had all the merits of "frictional hold," "lateral pressure," "crowding the metal back," etc., claimed for the patents in suit.

| Prior Practice | Plaintiff's Screws | Defendant's Screws |
|---|---|---|
| 1. Machine screws with close threads. | 6. 1927 Z type screw with wood threads and grooves. (See cut below) | |
| 2. Wood screws with threads spaced apart. | | 7. 1931 screw with machine threads, grooves and slot. |
| 3. A type screw put out by plaintiff in 1913 Wood type with hardened threads. (See cut below) | | 8. 1932 screw with machine threads, rolled on curved dies body taper, threads same height. |
| 4. Screws with hardened threads. | 9. 1934 screw with machine threads and groove. | |
| 5. Tapered blank rolled on straight dies grooves at end sold to piano dealers before patents in suit issued. | 10. 1935 screw rolled on curved dies, no groove resembles 8. | |
| | 11. Like A type without point. | |

Plaintiffs claim that patent 1,809,758 is particularly directed to putting the screw into thicker metal. The patent itself does not support that statement. Apparently the statement is based upon the following language of the specification: "Among the objects in view are: First, to facilitate entry of the rib or thread to relatively great depth in the work with less resistance," etc. This evidently means trying to make the thread bite into the work laterally as far as possible. Penetrating thicker metal was not intended. This appears from other quotations from the specification: "Since the improved fastener is designed and adapted especially for use in metallic work, and particularly relatively thin material," and "Fasteners embodying the invention are at present extensively and successfully used for connecting sheet metal of eighteen gauge to sheet metal of fourteen guage," etc. There is no basis in the patent for the suggestion that it is directed to screwing thick metal.

962

Patent No. 1,809,758 is directed entirely to the supposed merit of the groove in the thread. For this groove the patent claims two advances: (1) The pincher effect; and (2) facilitating the entry. Both are found in the following extract from the specification: "When the pilot 6 has entered the aperture in the work sufficiently for the entering termini of the edges 4' to contact with the work, the fastener or screw is revolved, as by the use of a screwdriver or like instrument engaging the kerf 3, and the said edges 4' enter the metal and form therein spaced grooves which are the beginnings of an internal thread. Owing to the location and form of the upper or longer edge 4', the entered material will be caused to flare upwardly, that is, in the direction of the length of the fastener or screw toward the head thereof, as clearly indicated in Figure 4. The continued rotation of the screw or fastener causes the entering ends of the edges 4' to pass on through the material of the work and beyond the same (when the work is of relatively thin sheet material), the said edges in passing through the last portions of the material of the work causing said material to flare in the direction of the length of the screw or fastener toward the pilot 6 which has passed beyond the work, so that the material of the work has the effect of having been thickened about the fastener and an additional purchase for the fastener is thus provided. Continued rotation of the fastener or screw causes the material of the engaged work to flow to successive positions, as indicated respectively in Figures 5, 6 and 7. As the thread or rib advances the bottom or base of the valley or groove 5 between the edges 4' outstands more and more and begins to crowd the material of the work lying in the groove outward in a direction away from the axis of the screw. This outward crowding action is also accomplished by a pincher action incident to the fact that the groove grows narrower as it grows less in depth, and the material of the work is thereby caused to flow into a more compact condition, which compact condition is indicated by the stippling at 12 in Figures 1, 5, 6 and 7. The material is thus crowded and flowed outward to the very terminus of the split or groove 5 in the thread or rib 4, and thereafter is entered by the cutting edge of the main portion of said thread or rib 4, so that the material about said thread within the work is in close, firm contact with the thread and offers powerful resistance to accidental dislocation. At the same time, it should be observed that because of the taper of the entering portion of thread 4, that is the portion provided with the groove 5, the said entering portion finds its way with relative ease and only a comparatively small amount of exerted energy to the final position for the ready admission of the main portion of the thread or rib 4."

The pincher theory is wholly wrong. What actually happens is that the material is forced outside just as in the old type A screw which has no grooves. There is a little squeezing together of the grains of the metal along the side of the thread. The grooved thread of the Z type screw shows the same effect. The whole theory of the operation of the thread in pinching the metal together is error. When the patent says the metal is compressed the grains in fact are all separate. The theory that the groove in the thread makes the screw hold better is untrue.

The other theory is that the groove in the thread makes the screw go in easier. The supposed proofs of this are all based on a comparison of the facility of inserting the A type screw with the Z type screw. An ex parte test, according to plaintiff, showed that it took 39 pounds to put in a Z screw and 76 pounds to put in an A screw, or nearly twice the force. These tests were repeated in open court. In the first test the Z type took 48 pounds and the A type broke in one test at 42 pounds and in a subsequent test at 37 pounds. Again the test was repeated in court. It was found that the A type screw was bigger on the outside and was accordingly harder to insert. Holes of proportionate size were used and the Z type took 45 pounds and the A type broke at 37½ pounds. There is, therefore, no proof that it is easier to insert the Z type than the A type.

Defendant isolated the effect of the groove and demonstrated that the patent is wrong in giving any effect to the groove. It was necessary to take a screw with the groove and another screw without the groove. This was done with both plaintiffs' screws and defendant's screws. The test was repeated in the presence of the other side. They showed definitely that when you isolate the groove it is of no effect, or, if anything, a slight disadvantage.

■ Patent No. 1,809,758 is invalid on two grounds: First, it covers a structure which has no novelty whatever, because

the prior art screws are exactly the same; second, it has no utility, as has been demonstrated. In fact, it covers merely a necessary incident and a useless incident of the old method of manufacture.

■ The patent on the groove lacks both novelty and utility. Assume that the attributes plaintiffs claim for the groove exist, you then come down to the function of the groove. But the function of a device cannot be patented. As Judge Walter Sanborn says: "Now, the function or result of the operation of a machine or combination is not patentable under our laws." National Hollow Co. v. Interchangeable B. B. Co. (C.C.A.) 106 F. 693, 708; Bullock Electric Mfg. Co. v. General Electric Co. (C.C.A.) 162 F. 28.

■ Patent No. 1,827,615 was applied for in 1922, and eight years thereafter plaintiffs made screw 11 under the patent. Plaintiffs admit they made but one sale of this screw to the Philco Radio Company in 1936. I have compared it with A type screw. There is some difference in the pitch of the thread. Other differences are microscopic. You cannot get a patent by merely cutting off the point of a screw that you have been making since 1913. The claims of this patent cover the taper on taper. There was nothing new or useful about taper on taper. What disposes of this patent is that the defendant has never used the taper on taper. We have the testimony of the man who designed defendant's screws and the testimony of the man who made the dies and rolled the screws. Both testified that defendant's screws are rolled on curved dies and have a thread of uniform height all the way down to the tapered end. A photographic enlargement of defendant's screws demonstrates that there is no tapering thread.

### Trade-Mark Infringement.

■ Plaintiffs seek to monopolize the use of the word "self-tapping" in connection with screws. A new meaning is sought to be given to the word "tapping." That "tapping" may be applied to a screw that does not tap but is freely rotatable in a hole tapped by a separate instrument.

The word "self-tapping" was used as far back as 1917 by Parker Supply Company, engaged in the sale of Rosenberg Type A Screws. That company went out of business in 1921. Parker-Kalon Corporation, one of the present plaintiffs, came into existence in 1922. It was not, however, a successor to Parker Supply Company, and did not obtain from that company any assignment of trade-mark rights. The word "tapping" has a well-defined meaning. It means "to furnish a hole with an internal screw thread"; "screw threading a hole." "Self" needs no definition. Obviously, the two words together mean that the screw taps itself. In other words, that the screw itself threads its hole. That a purely descriptive word cannot be appropriated by any one as a trade-mark is so well settled as to need no citation of authority.

From 1912 to the present time, others have used "self-tapping" in its dictionary sense. In "Surgery, Gynecology and Obstetrics," 1912, we find reference to "Sherman Tap Screws" and "Vanadium Steel Self-tapping (fluted) Screws." In an article appearing in the journal, "Annals of Surgery," 1919, reference is again made to "self-tapping or cutter-pointed screw." In a Bureau of Standards circular issued in March, 1932, an illustration of a screw is labeled, "Self-tapping screw." The record is replete with like references.

There is in evidence an original box put out by Parker Supply Company bearing a label "Parker Hardened Self-Tapping Sheet-Metal Screws." The name "Parker" indicated origin while the words "hardened," "self-tapping," and "sheet-metal" were ordinary English words descriptive of the product. Below is a reproduction of a label put out by the present plaintiff corporation.

It speaks for itself. Obviously, the indication of origin is the name "Parker-Kalon." The inconspicuous words "hardened," "self-tapping," and "sheet metal screws" are descriptive of the character, operation, and purpose of the product. Plaintiffs' advertising matter in evidence contains many statements emphasizing the descriptive sense in which the plaintiffs have been using the word "self-tapping." The way in which plaintiffs have used the

word "self-tapping" precludes all possibility that the word has come to indicate to any one the origin of the product. It is likewise established by the evidence that the word "self-tapping" has never been used by the defendant in any other sense than in a descriptive sense. It is clear that the word "self-tapping" cannot be appropriated by plaintiffs as a valid trademark.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½.

The bill of complaint must be dismissed.