### STARLOCK MFG. CO. et al. v. KUBLANOW et al. and three other cases.

#### Nos. 6785–6788.

Circuit Court of Appeals, Third Circuit.

Aug. 8, 1939.

Rehearing Denied Oct. 2, 1939.

Samuel Ostrolenk, of New York City, and Julius E. Foster, of Pittsburgh, Pa., for appellants.

Wm. B. Jaspert, of Pittsburgh, Pa., for appellees.

Before MARIS, CLARK, and THOMPSON, Circuit Judges.

CLARK, Circuit Judge.

The circumstances of this case incline us to agree with what Professor Vaughan says in his provocative book, Economics of Our Patent System (1925): "The very large number of patents granted by the United States to its own citizens and foreigners is undoubtedly one of the sources of litigation. This country grants more patents than any other; in fact, it has granted up to date approximately one-third of all the patents conferred by all nations. Thousands of patents overlap each other to a considerable extent. They may describe means which vary only slightly in performing the same function or in accomplishing a particular result; for example, there are hundreds of patents on safety razors, and thousands on wrenches. This leads to infringement suits, disappointment of inventors, and the general disrepute of the patent system". pp. 182, 183. And see also, Kaempffert, Our Defective Patent System, The Outlook, July 6, 1912; Oldfield Hearings of 1912, No. 4, p. 36; Nolan Hearings of 1919, pp. 57, 58; Report of Commissioner of Patents to Congress, December 1920, p. 12. We are concerned with five of their grants for structures, all of which embody the same idea. These grants are two to Kublanow, No. 2,039,171, for a wall tie, patented April 28, 1936[1] and No. 20,116, for a side wall mounting structure, reissued September 22, 1936[2], the individual plaintiff-appellee, and one to Hornicek No. 2,054,511, for spacing and supporting means for brick veneer walls, patented September 15, 1936[3], and two to Kerner No. 2,054,512, for locking means for tiles and bricks, patented September 15, 1936[4], and No. 1,955,587, for building unit, patented April 17, 1934[5], assignors of defendants-appellants. The differences between them are, we think, those "shades of a shadow" of Mr. Justice Bradley's famous phrase. Inevitably litigation among the shades ensued.

The art of this instance of the Office's beneficence is an aspect of things as they are not. The builders or improvers of small wooden houses (especially in the Pittsburgh area) have found it useful to cover their walls with a layer or veneer of thin brick, asbestos or tile (cf. "a rogue in grain veneered with sanctimonious theory"). This overlay is made by using 1/2 inch slabs baked or burned in the fashion of their less showy but more substantial brethren. The slices are then affixed to the wooden walls with the usual mortar and the finished house was to all outward appearances Georgian or otherwise brick. It is fair to add that this outer covering is also useful for insulation and to avoid repainting.

The dramatis personae (or corporate) of the proceedings are all practical builders in the Pittsburgh District and the various companies formed or licensed by them. All, that is with one important exception, the defendant-appellant Foster, who appears in a dual capacity. He is a builder of both patents and of patented articles. He prosecuted the other defendants' patents in the Patent Office on interference and ex parte, is prosecuting this litigation, and

---

[1] Continuation of application Serial No. 580,036, December 10, 1931; this application October 20, 1933, Serial No. 694,442.

[2] Original No. 1,932,274, dated October 24, 1933, Serial No. 581,625, December 17, 1931; application for reissue April 20, 1935, Serial No. 17,459.

[3] Application May 16, 1933, Serial No. 671,333.

[4] Application June 22, 1932, Serial No. 618,751.

[5] Application February 1, 1933, Serial No. 654,757.

owns stock in the defendant licensed building companies.

In 1930 plaintiff-appellee Kublanow was a salesman of asbestos and asphalt shingles in the employ of one Klein, a manufacturer of the same. Sometime prior to November 24, 1931, he "designed" a wall bracket or wall tie for the better affixing of the brick or asbestos slabs or tiles. On that date he agreed with his employer to apply for a patent for this device and to assign to the latter a one-half interest in such patent "when, as, and if issued" in exchange for an agreement to manufacture and pay royalty. The application was duly filed on December 10, 1931 and after proceedings (of which more hereafter) ripened into patent No. 2,039,171, April 28, 1936. Klein never lived up to his part of the bargain and so there was no commercial use of these wall ties. However, plaintiff-appellee Kublanow a week later, December 17, 1931, filed another application for another similar structure. This application, after various proceedings (of which again more hereafter) also ripened into a patent (original No. 1,932,274, October 24, 1933—reissue No. 20,116, September 22, 1936). The wire mesh of this patent was manufactured by the National Steel Fabric Company and was applied commercially for the first time in April 1932 (contract date, April 30, plaintiff-appellee's exhibit No. 57) to the house of one Van Orsdell (defendants-appellees' exhibits A and B). The construction of this house was observed by the defendant Kerner. In the one and one-half years thereafter, Kublanow sold mesh to licensees Goodman and Waldman in amount sufficient for 125 homes, approximately. At the end of this period, the battle shifts from the field to the office.

The proceedings here are truly remarkable. There are four separate interferences. There are two exactly opposite opinions by examiners of interference. There is one opinion by the Board of Appeals of the Patent Office. There is one refusal to act by the Commissioner under his supervisory powers. Finally and most wonderful of all, the Patent Office granted five patents for the same thing. Professor Vaughan, from whom we have already quoted, thus characterizes interference proceedings in the Patent Office.

"* * * If two or more applications for the same invention are pending in the Patent Office at the same time, an 'interference' is declared for the purpose of ascertaining to whom the patent should be issued. About one percent of the patents issued have been in interference. The procedure is usually complicated, prolonged, and expensive. It is judicial and technical in nature and therefore requires the employment of patent lawyers and the testimony of skilled experts. Many appeals are possible. The examiner of interferences gives the first decision and then appeals may be taken successively to the examiner in chief, the commissioner of patents, and the Court of Appeals of the District of Columbia. The Federal courts offer other possibilities for the continuation of the litigation". Vaughan, Economics Of Our Patent System, p. 153[6].

The interferences are numbered 66,459, 66,948, 68,453 and 69,912. We are not concerned here, of course, with their adjudications of priority. In No. 66,459 incorporated in the record only by reference, Supp. Rec. 24, one Horowitz (mirabile dictu not a patentee) conceded certain counts to plaintiff-appellee Kublanow. In No. 66,-948, two, Krasne, partner of defendant-appellant Foster, and Levaur, unidentified (two more mirabile dictu not patentees), abandoned their claims and allowed a default to go against them, Record, 167-C. In interferences No. 68,453 and No. 69,912 the examiners also considered the technical question of abandonment by Kublanow. The rather confused state of the record makes it difficult to determine whether or not they maintained their average and differed. One seems to have found the joint application of Kublanow and Klein abandoned, Record 49-D. The other seems to have found that an ex parte affidavit by Klein cured that abandonment and entitled him to the filing date of the joint application, Supp. Rec. 11. At any rate, we are no more concerned with these differences than we are with the adjudications as to priority.

What we are concerned with and what is the principal question of the case arises, however, from the language employed by these examiners in framing the issue before them. This language, following ancient Patent Office procedure, is in the form of a count. It first appears so far

6 Since Professor Vaughan's book was written, the Congress has altered the nomenclature and organization of the courts referred to.

as the record discloses in interference, No. 66,948, Record 161-C, and is repeated in haec verba in No. 68,453, Supp. Rec. 5. The count reads: "A mounting for tiles and the like comprising a metallic stripping consisting in a plurality of independent strip units adapted for mounting in spaced relation on a surface to be tiled, each strip unit having thereon resilient tangs upstanding from the face thereof to define a tileway between cooperating tangs from adjacent mounted position by abutment of its opposite edges against cooperating tangs on adjacent mounted strips and the width of the tileway is determined by the spacing of the strips as mounted." Count 1, Exhibit 2a.

Before quoting the Patent Office decisions, it may be as well to describe briefly and from the patents, the different structures of the various persons who have received its imprimatur of invention. Kublanow has two, a strip and a mesh. The strip, No. 2,039,171, consists of a short metal channel the ends of whose flanges were bent out and up (patent jargon "spread laterally") making a half-inch shelf or porch. In three of the accompanying figures (5, 6 and 7) the portion of the flange not bent up ("spread laterally") is slit and "bent laterally in opposite directions at their ends to produce a zig zag effect", No. 2,039,171, page 1, line 25. The slab bricks or tiles are to be fitted between the flanged strips and to rest on the upturned ends thereof and the "zig zag effect results in interlocking engagement with the mortar", No. 2,039,171, page 1, line 27. The mesh, No. 20,116, on the other hand, is simply a net work of spaced wires with the vertical wires bent up at regular intervals in the shape of tiny croquet wickets (patent jargon "gripping portions of pockets", accompanying figure 9).

Kerner has two patents. The first and the one in suit, No. 2,054,512, prescribes channeled horizontal metal strips at "slab or tile intervals". At short and regular longitudinal intervals each strip is punched to provide small oblongs (parallelograms) and are described as "resilient", No. 2,-054,512, page 1, line 35. In the second patent, No. 1,955,587, the strips are vertical and at the necessary intervals are raised in the same old croquet wickets, this time described in patent jargon as "outwardly divergent loops or V-shaped resilient saddles", No. 1,955,587, page 1, lines 59–61.

Hornicek has one patent, No. 2,054,511. The strips are channeled, vertical, and are "provided with punched out resilient bowed projecting clips," No. 2,054,511, page 2, line 60. The only difference between this patent and the first to Kerner seems to lie in the fact that the projections are not double but single and alternating (patent figure 4).

The significant and proportionately disputed word in the earlier quoted count and in the patents is "resilient". Except for the differences in the Patent Office and the earnest and able argument in this court, we should have been surprised at the existence of a contest about what seems to us such a simple matter. We set forth those differences in the words of the Patent Office officials passing thereon. The anonymous examiner in room 3714 in his opinion on Interference No. 68,453, June 21, 1935 (Record 45-D) says:

"* * * It is further alleged that Kublanow does not disclose tangs having the limitations of the count nor a tileway having a dimension determined by the strips as mounted.

"Figs. 3 and 5 of Kublanow show a strip unit adapted for mounting in spaced relation as shown in Fig. 1, and each strip unit has resilient tangs upstanding from the face thereof as shown in Figs. 4 and 6". Record 45-D at 48-D.

Examiner Wyman, on the other hand, in his opinion on Interference No. 69,912, September 8, 1935 (Record 63-D) expresses a directly contrary view. He says: "An examination of the original specification would indicate the invention resides in a frame for spacing and holding veneered tiles in a certain relation without the aid of any resilient feature of the parts. The fact that the bricks are gripped in the frame does not imply necessarily that, the frame is elastic or resilient". Record 63-D at 64-D.

This last decision was appealed to the Patent Office Board of Appeals and the three examiners in chief constituting that Board, 35 U.S.C.A. § 57, promulgated an opinion reversing the primary examiner. They said:

"In the paragraph commencing at line 75 of page 2 of the Kublanow patent, it is stated that:

"'In Figure 9 the cross strands 7 are shown to be slightly deformed in the shape

of a bead 6 to produce a spring or clamping action when the brick slab is forced therebetween although the construction shown in the remaining figures of the drawings is sufficiently springy to provide a clamping engagement of the wire mesh with the brick'.

"The reference to Fig. 9 obviously means Fig. 10.

"It is the contention of the party Horowitz that, since the claims involved in the prior interference did not specify that the holding members for the slabs were of a springy nature, the present counts, which do include the spring detail, relate to a different invention from that involved in the prior interference and therefore that he is not estopped because of his failure' to propose the present counts in the earlier interference. He also urges that, because the party Kublanow did not specify a spring element in the claims of his original patent, he cannot in his reissue claims.

"It is to be noted in the above-quoted paragraph that, not only is the structure shown in Fig. 10 described as of a springy nature, but this is also stated to be true of the structure, shown in the remaining figures. It is our opinion, therefore, that the claims constituting the issue of this interference involve merely a more specific limitation on the same generic invention covered by the counts of the earlier interference". Record 43-D-44-D.

As illustrative of the bitterness existing between the parties, we observe the attempt to change this holding of the Board of Appeals. An elaborate petition for rehearing was filed and denied, Supp. Rec. 25, and the disappointed parties, surely slightly prejudiced, attempted, Supp. Rec. 30-44, and failed, Supp. Rec. 45, to invoke the supervisory jurisdiction of the Commissioner.

We think it is unfortunate that the examiners of interferences selected as a basis of the counts in interference what appears to be the precise language of the junior party's application, Kerner, No. 1,955,587. Such a choice was bound and did give that party the belief that his was the ingenuity and the skill. This unimaginative borrowing of language must not obscure our duty to study it both independently of its source and in relation to the actual mechanical conception of Kublanow. We venture the thought that no one but a patent solicitor would have had the verbal nightmare implicit in the phrase "resilient tangs". As a study in etymology, it is interesting to note that the adjective resilient comes from the Latin, resilire (re-, back, salire, leap), New Century Dictionary, Vol. 2, p. 1534, and the noun tang comes from the Scandinavian, tange (projecting point, spit of land), New Century Dictionary, Vol. 2, p. 1941, the word from which tongue is also derived.

However that may be, the "resilient" part of the phrase is intended to describe a very common property of many elements or combinations of elements. That property is recognized by the physicists and chemists and is referred to in their writings.

"There are various other physical properties of metals which determine their usefulness in the industries, such as strength (ability to carry a load), elasticity (ability to change their shape and recover their original form), hardness (ability to withstand wear and resist penetration), and endurance (ability to withstand repeated stresses and shocks). These mechanical properties are of the greatest importance to the engineer, and the metallurgical chemist is trying to correlate them with the chemical structure of the various metals and alloys". Black and Conant, New Practical Chemistry, p. 477.

As we understand it, its presence or absence depends on the crystalline structure of the particular element, R. V. Southwell, Theory of Elasticity, 1936.

All that the first inventor, Kublanow, has done is to take advantage of this physical property. He has realized that any foreign body pressed against elastic (resilient) metal will bend it and so will be subjected to the pressure of its rebound. The mere fact that in his first patent, No. 2,039,171, he also uses inconvenient lateral supports and that in his second patent, No. 20,116, some mortar is also necessary, does not detract from the essence of his discovery. By the same token, his genius is not affected by the fact that his rivals have devised better means of availing themselves of the property of elasticity (resiliency) aforementioned.

What we have said expresses, clearly we hope, our agreement with, rather than our reliance on, the Board of Appeals of the Patent Office. We are not then constrained to resort to any doctrine of presumption. This is in accord with our own

500

preference. In the patent field the "logical core" of probability that underlies or is supposed to underly all presumptions, Chafee, The Progress of the Law, 1919-1921, 35 Harvard Law Review 302, 311, may exist. The examiners are, in theory at least, selected for their expert knowledge. The finding of invention implicit in their grant may justify the "presumption of validity" (a subordinate application of the maxim omnia praesumuntur rite esse acta, donec probetur in contrarium). Our own impression is that particularly in recent years, theory has yielded to practice. In no other way can we account for the swarm of paper patents which, like the locusts, destroy the ripe grain of legitimate genius. It seems to us the old and sad story of the "pressure group" and the overworked and underpaid bureaucracy. The cohesive and energetic body of patent solicitors wear down (note the incredible number of amendments and interviews in the file wrappers) the civil servant who is often waiting for his first opportunity to leave his side of the fence for the rich pasture beyond. The present procedure so shocked the distinguished counsel appearing before a Senate Committee that he said: "This is a dangerous and lawless doctrine. Carried to its logical conclusion, it gives to a patent examiner in a secret proceeding the power to grant a private monopoly; a prerogative once taken away from the crown by our Anglo Saxon ancestors many years ago by bloody conflict". Hearing on Dill Bill, § 4442.

It is fair to say that in the matter of interferences there may be less temptation. That kind of examiner is not so directly concerned with appraising the intangible touch of genius. He is rather using the "mechanical skill of the ordinary patent office examiner" to estimate the actual structure of the application. As we have said, we are in agreement with that estimate in the case at bar. Even if we were not, the controlling cases might well preclude our exercise of independent judgment. So we find the Court of Customs and Patent Appeals speaking on a similar problem through Graham, Presiding Judge, and saying: "The question arises whether the counts of the interference which are framed on Pritchard's structure, and which plainly read thereon, and have a definite meaning when read in the light of Pritchard's application, can be read upon Farmer's disclosure. The answer to this ques-

tion involves, to a considerable degree, exact technical learning. The tribunals of the Patent Office, which have dealt with the question of priority having concurred in their views that the counts did not so read, this court will not feel at liberty to reverse the same, unless it feels that such decisions are manifestly wrong". Farmer v. Pritchard, Cust. & Pat.App., 65 F.2d 165, at page 168. See, also, Hill v. Hill, Cust. & Pat.App., 54 F.2d 950, at page 953; Bloom v. Locke, Cust. & Pat.App., 69 F.2d 113, at page 117; Angell v. Morin, Cust. & Pat. App., 69 F.2d 646, at page 649.

By way of summary, Kublanow, a practical builder engaged in the "face lifting" of small houses, covers the wall of one particular small house (Van Orsdell) with a wire mesh and slides his slabs in between the regularly-spaced humps of the vertical wires. He thinks well of the idea and applies for a patent on its typical structure and on a cognate one which substitutes a strip with turned up end and side flanges slit in zig-zag fashion. Both the humps and the slit flanges, having elastic properties, stretch to permit the entry of the slabs and on resuming their original shapes hold or clamp them in place. Kerner, an architect, sees the aforesaid house and likes this idea for holding the veneering pieces. He consults a patent attorney (the witness and counsel Foster) and in part at least as a result of the latter's efforts, he and other friends and associates of Foster (Krasne, Horowitz and Hornicek) soon had applications in the Patent Office. In the inevitable and usual interference proceedings, the "counts" (subject matter for adjudication as it appears to the examiner, In re Ellis, Cust. & Pat.App., 47 F.2d 963), are drafted in the language of the eventual office loser. Five patents are granted. four of them are used as a basis for suits in equity for infringement by way of bill and cross bill. The plaintiffs-appellees also ask for a judgment under the interfering patents section, 35 U.S.C.A. § 66; Stringham, Patent Interference Equity Suits, section 7901 et seq.

There remains one other matter—validity. As all the parties have, as we started by observing, patents for the same thing we should not expect this issue to be very hotly contested. Nor was it. In our capacity as guardian of the public interests, however, we must consider the question. The examiner in interference No.

68,453 discussed four prior art patents, Rosenbaum No. 658,868, Liptak No. 1,454,293, Denk No. 1,728,231, Bennett No. 1,829,976, Record 47-D. Defendants-appellants seem satisfied with his views on three of them, because in the District Court they cited only the one to Rosenbaum, No. 658,868, Record 159-D. They add thereto five more, Pyron No. 1,861,359, Aberson No. 1,933,237, Vertuno No. 2,022,263, Kraus No. 1,853,824, Mortenson No. 1,850,961, Record 164–165. Of all of these, two, Rosenbaum No. 658,868, and Pyron No. 1,861,359, are concededly the closest. Pyron seems both in time and in language to have derived something from these litigated patents. They both lack the "casus belli" of the interference proceedings, i. e., the elastic, gripping, clamping, springing, resilient, or "what have you" element. In Rosenbaum the vital channels are constructed so that the "undercut edges of the projections of the slabs" fit into grooves in the corresponding ridges. An argument contra invention might be based on the lack of genius involved in the application of a well-known property, elasticity (resiliency) of some metals, to the particular use of the principal case. We think that a realization of the very appropriateness of that property to this use does involve more than mechanical skill.

We conclude with a technical recapitulation. We agree with the learned District Court in its holding that the two patents to Kublanow, No. 2,039,171 and No. 20,116, are valid. By the same token, we agree that any and all structures embodying that invention infringe and must be enjoined. This is so whether or not the Patent Office has given them the shield of a patent. This requires the restraint of the Kerner and Hornicek structures. The respective patents to the latter are relevant only to the interpretation of 35 U.S.C.A. § 66. Here also we agree with the District Court in its invalidation of the paper patents. The cases cited by learned counsel for defendants-appellants are all to be found in the notes to the United States Code Annotated above cited, at page 450 of the original and page 233 of the supplement. He bases his argument on the lack of identity of the interfering patents. We think he has overlooked the inclusion of the word "substantial" in the ratio decidendi of the cases above referred to.

The decree of the District Court is affirmed.