**LORENZ et al. v. COLGATE-PALMOLIVE-PEET CO.**

PEET CO.

No. 7663.

Circuit Court of Appeals, Third Circuit.

Oct. 1, 1941.

Rehearing Denied Oct. 30, 1941.

Thomas Ewing, of New York City, and Harry B. Rook, of Newark, N. J., for appellants.

Frank E. Barrows, of New York City, for appellee.

Before BIGGS, MARIS, and JONES, Circuit Judges.

**JONES, Circuit Judge.**

The plaintiffs, as the persons interested in Lorenz Patent (No. 2,084,446), one of two interfering patents, brought suit under Section 4918, Revised Statutes, 35 U. S.C.A. § 66, against the defendant as the owner of the other interfering patent (Ittner, No. 1,918,603). The bill of complaint prayed for an adjudication that Lorenz was the first and original inventor of the process set forth in his patent, that his patent is good and valid and that the Ittner patent is void, inoperative and invalid as to certain claims thereof, and for injunctive and further relief.

Both patents cover a process for the manufacture of soap and the recovery of glycerine. That they are interfering within the contemplation of Sec. 4918, R.S., is quite obvious. The nineteen claims of the Lorenz patent (No. 2,084,446) were copied verbatim from the first nineteen claims of the Ittner patent (No. 1,918,603). The circumstances under which these patents, embracing identical claims, were issued respectively to each of two different applicants were as follows.

On January 24, 1920, the party Lorenz, having conceived a method of making soap with attendant recovery of the glycerine by distillation, filed a patent application covering his alleged invention. With a view to interesting the defendant's predecessor (Colgate & Company) in the process, Lorenz contacted one Ittner, the chief chemist of Colgate & Company, and, on January 31, 1920, he gave Ittner an exact copy of his patent application. Ittner's only expressed reaction at that time to the method of soap-making disclosed by the Lorenz application was an objection on commercial grounds that the soap, when made, would "have to be shoveled out' of the apparatus, and that requires labor, and labor means money." Ittner retained the copy of the Lorenz application for two or three weeks and then returned it to Lorenz with the statement that his company was not interested. He did not claim to have already entered the field covered by Lorenz's conception or that the process lacked patentability. Lorenz, who had prepared and filed, and was personally prosecuting, his application, ran into difficulty in the Patent Office with respect to the patentability of his original claims; and, on May 28, 1928, his application was held to have been abandoned for want of prosecution.

On July 18, 1933, a patent was issued to the defendant company, the assignee of Ittner, covering a process for making soap and glycerine, for which patent Ittner had made application on February 19, 1931. Lorenz, upon learning of the Ittner patent and asserting that the claims thereof embodied the teaching of the Lorenz application of 1920, filed a new patent application on November 8, 1934, as a refiling of his abandoned 1920 application. In the new application Lorenz set forth, as his claims of invention, the claims speci-

fied in the Ittner patent and relied on his 1920 application as showing his prior conception of the alleged invention. Interference was declared by the Patent Office and a proceeding was duly had to determine the question of originality as between Lorenz and Ittner. The Examiner made a report finding that Lorenz was the original inventor as to the first nineteen counts in interference (Ittner's first nineteen claims), and decided that a patent therefor should issue to Lorenz. No appeal was taken and the patent issued accordingly. Ittner's additional claims for removing soap from the retort and replenishing the mass therein, while the process was in operation, form no part of any claim under the Lorenz patent. Our references to the Ittner patent should, therefore, be understood as embracing only the first nineteen claims thereof.

■■ The learned court below made point of the defendant's allegation that the reason no appeal was taken to the Patent Office tribunals was because notice of the Examiner's report and decision was not mailed to the "active" counsel for the defendant. Even if the Patent Office had been derelict in not notifying "active" counsel for the defendant of the Examiner's decision, the matter could not be of any possible materiality to the question of fact whether Lorenz or Ittner was first in conceiving the alleged invention. However, the Patent Office was not at fault. Notice of the Examiner's decision was duly mailed to and received by the attorney of record for the defendant and, so, complied with the requirements under the rules of the Patent Office (Rule 7, Rules of Practice). Moreover, the duty of the court below to hear and determine the controversy in the exercise of its power under Sec. 4918 R.S. in no way depended upon whether or not an appeal was first taken to Patent Office tribunals. Cf. Starlock Mfg. Co. et al. v. Kublanow et al., 3 Cir., 106 F.2d 495, 497.

■ In a case such as the present the merit of the Patent Office decision primarily invites consideration. In appraising the weight to be given to it, the courts are constrained by a well settled rule of law. The Supreme Court said in Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657, that "Upon principle and authority * * * it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the

decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction." Quite understandably, this rule has been respected and applied generally. Loughran v. Quaker City Chocolate & Confectionery Co., Inc., 3 Cir., 296 F. 822, 825; Curtiss Aeroplane & Motor Corp. et al. v. Janin et al., 2 Cir., 278 F. 454, 455; Gold et al. v. Newton, 2 Cir., 254 F. 824, 827; Gold et al. v. Gold, 7 Cir., 237 F. 84, 86.

■■ No reasonable distinction can be drawn from the fact that the suit in Morgan v. Daniels, supra, was instituted under Sec. 4915, R.S., 35 U.S.C.A. § 63, to compel the issuance of a patent while here the suit is under Sec. 4918, R.S., and seeks an adjudication of priority of invention and patent validity. The reason underlying the rule as to the presumptive validity of a material Patent Office decision is the same in either instance. The thing of compelling importance is that the Patent Office decision represents the determination of an administrative body, based upon the findings of an expert in the particular field of inquiry, made by him while acting in a quasi-judicial capacity, in a contested proceeding where the rights of interested parties were fully represented. See Gold et al. v. Gold, supra, 237 F. at page 86. Consequently, the rule was applied by this court without question in a case where the suit had been brought under Sec. 4918 R.S. Earles v. A. W. Drake Mfg. Co. et al., 3 Cir., 300 F. 265, 267. See also Ecaubert v. Appleton et al., 2 Cir., 67 F. 917, 921. Nor is the rule rendered any less applicable because, in determining the question of priority of invention, it becomes necessary for the Examiner to construe and interpret interfering patents. In determining priority of invention, "it is just such questions that the administrative tribunal is pre-eminently qualified to solve." Gold et al. v. Gold, supra, 237 F. at page 86.

Turning to the record now before us, we are unable to perceive wherein there is any testimony which carries thorough conviction that the Examiner's decision was in error. On the contrary, were it this court's duty to determine, de novo, the fact of priority, we should find from the evidence adduced in the court below precisely as the Examiner had theretofore found

from substantially the same evidence. While we thus directly confirm the correctness of the Examiner's decision, the difference of opinion between us and the learned trial Judge, hereby indicated, as to what a "thoughtful and impartial scrutiny of the examiner's views" actually discloses, of itself, indicates a want of that certainty which is necessary to carry thorough conviction of error before a court may appropriately set aside a Patent Office decision upon a question of priority of invention in an interference proceeding. Cf. Gold et al. v. Newton, supra, 254 F. at page 827.

In the face of the Examiner's decision, it is unnecessary for us to go beyond the points of difference, as alleged by the defendant, between the process disclosed by the Lorenz 1920 application and that described in the Ittner patent. That both processes relate to saponification of fats or fatty oils and the recovery of glycerine by distillation through the use of a vacuum and high temperatures admits of no doubt. The Examiner aptly described the invention as follows: "The gist of the invention in issue is the production of soap and glycerine by the saponification under reduced pressure of a fat or fatty oil by thorough agitation in the absence of air and in intimate contact with steam. The above conditions make it possible to carry out the saponification reaction at 'a temperature in excess of the melting point of the resulting anhydrous soap,' at a temperature to maintain the soap in 'a molten, substantially anhydrous state' or at 'a temperature producing an appreciable vapor pressure of glycerine.' Such a method permits a recovery of glycerine in undecomposed form and produces a soap which is not discolored."

It is the defendant's contention that the gist of the Ittner process was the use of temperatures so high that the resulting anhydrous soap was in thin liquid form and, hence, capable of thorough agitation by steam. Ittner prescribed a thermal range for the operation of his process of from 150 degrees C. to 350 degrees C., while Lorenz's range was 250 degrees C. to 270 degrees C. But, the defendant asserts that anhydrous soap does not become a thin liquid under 290 degrees C., or, if it is to become a thin liquid at temperatures within the Lorenz range (250 degrees C. to 270 degrees C.), it can do so only through the addition of a flux, which Lor-

enz did not specify. Yet, neither did Ittner prescribe a flux and his temperature range went well below the minimum of the Lorenz range. Consequently, if a flux is necessary to render the soap thinly liquid within the Lorenz range at reduced pressures, it is likewise necessary within the Ittner range, for the Ittner range embraces the Lorenz range. The defendant's contention, however, that anhydrous soap does not melt under 290 degrees C. is not in keeping with Ittner's representations during the prosecution of his patent. In an amendment thereto, he stated that the melting point of soap, when anhydrous, "is usually above 250 degrees C. and certainly never lower than 150 degrees C." According to Ittner's further disclosures "a temperature *approximating* 300 degrees C." would suffice, and he expressly stated that "the reaction described may be carried out at temperatures *considerably under* 300 degrees C." (Emphasis supplied above.) Moreover, these references are to temperatures at atmospheric pressure without any allowance for the reduced temperature required at a diminished air pressure.

The Examiner was warranted when he said that "it is not believed to be conclusive that the soap mass of Lorenz was solid rather than viscous or liquid." Nor was the effect of this to place the burden upon the proponents of Ittner who was senior to Lorenz with respect to the grant of patents. As the junior party, it was Lorenz's burden to establish priority of invention. But the burden of going forward with evidence in support of the affirmative defense interposed by the defendant that soap would not melt within the Lorenz range of temperatures at diminished pressures was upon the one so asserting.

The advantage of "thinly liquid" or molten soap during the operation of the process is that thorough agitation by steam is possible, which serves to prevent local overheating and aids in the distillation of the glycerine. The defendant asserts that agitation of the soap mass was not mentioned in the Lorenz 1920 application. True enough, by that term, the operation was not so described, but what Lorenz specified spelled agitation by steam. Under the Ittner patent, the agitation was to be accomplished by passing steam through the soap while it was in liquid form from heat. Likewise, the Lorenz application prescribed "passing steam through the soap mixture," etc. This, of course, meant agita-

tion of the liquid mass whether Lorenz specifically so labeled the operation or not. Before you can pass steam through a solid mass, the mass must be made permeable and, when steam is passed through a permeable liquid mass, one of the effects of the operation is to agitate or stir up the mass. There was testimony to that effect and the Examiner was correct in his reference to the agitation of the soap mass as applicable to both the Lorenz application and the Ittner patent.

In an effort to deny liquid form to the soap mass under the Lorenz process as well as to suggest its impermeability to steam infiltration, the defendant refers to the Lorenz soap as a solid. The learned court below found that it was. This was contrary to the finding of the Examiner and was without direct evidence to support it. Because Lorenz had referred to his soap as "dry" and because Ittner had objected to Lorenz's original disclosure on account of the expense entailed in shovelling the soap out of the retort upon completion of the process, the learned court below concluded that Lorenz's soap during the operation of his process was a solid. But it was not a solid simply because it was "dry." It was "dry" because it was anhydrous, that is, free from water or all but traces of water. A thing may be anhydrous without regard to whether it is a solid or a liquid in form. At a temperature even slightly in excess of 100 degrees C., the boiling point of water, soaps lose their water rapidly and eventually become anhydrous. The Ittner patent application so states. At a sufficiently high temperature, therefore, a soap may be molten or liquid and, yet, exceedingly "dry."

On the basis that prior art had taught that if soap be heated in excess of 250 degrees C. decomposition will occur, the defendant argues that Lorenz could not, therefore, have intended a temperature sufficiently high to melt the soap. The merit of this argument was peculiarly for the expert appraisal of the Examiner who rejected its implications. Certain it is that Lorenz's prescribed range of temperature (250 degrees C. to 270 degrees C.) was within the decomposition area which Ittner assigns to the prior art. There was reason, therefore, to find that Lorenz had disregarded the particular teaching of the prior art the same as Ittner claims to have done. Nor is the effect of this conclusion to be wiped away' by the defendant's suggestion that the temperature which Lorenz prescribed was in practice less than 250 degrees C. so far as the soap mass was concerned.

The defendant urges that Lorenz's requirement that the retort be "heated preferably up to 250° to 270° Centigrade" refers to the temperature of the retort and not to its contents. The Examiner, however, found to the contrary, and his finding was fully warranted. As the Examiner's report aptly points out, "it is common parlance to refer to the temperature of the retort or vessel containing the chemicals intending of course that the skilled chemist would measure the temperature of the reaction mixture rather than that of the retort. * * * Moreover it is most unusual to measure the temperature of the reaction vessel. Temperatures are usually obtained by inserting a thermometer into the mixture inside the reaction vessel." There is scientific authority supporting the Examiner's conclusion. See Strealfield's "Practical Work on Organic Chemistry," pp. 10-13, and Haskin's treatise on "Organic Chemistry," pp. 152, 153. Ittner himself finally admitted on cross-examination that an expression in Strealfield, supra, that "The retort is heated very gently and carefully at first," meant that the *contents* of the retort were so heated. And counsel for the defendant and a defendant's witness whom he was examining both plainly indicated that they understood a prescription, that a flask be heated, to mean that "the contents of the flask" were to be heated.

Finally, we are unable to see any indicated difference between the Lorenz and the Ittner conceptions growing out of Lorenz's insistence upon the use of a vacuum in obtaining the desired reaction. Throughout Ittner's claims he uniformly specifies that the process is to be carried out "in an atmosphere free of air," or "excluding air," or "excluding substantially all air," or "with the exclusion of air," etc. These disclosures of course call for the use of a vacuum as much so as if Ittner had by name prescribed a vacuum. The plainly evident fact is that a vacuum was as much an essential part of the process under the Ittner patent as it was under the Lorenz original application.

We can find no justification in the evidence for overruling the Examiner's finding that the first nineteen claims of the Ittner patent embodied the teaching of the

disclosures made in the Lorenz 1920 application. With that established, the award of priority of invention to Lorenz followed as a necessary consequence under the undeniable facts. It cannot be seriously disputed that Lorenz disclosed to Ittner in January 1920 his patent application, which Ittner had ample time to study and absorb. And, equally certain is the fact that Ittner does not allege a date of conception prior to the Lorenz disclosure. The learned court below therefore erred in awarding priority of invention to Ittner and in holding the Lorenz patent invalid on that ground.

This leads directly to a further question as to the patentability of the Lorenz invention. The defendant alleges that the Lorenz patent is invalid because of (1) prior public use, (2) anticipation by prior art patents, (3) abandonment of the invention by Lorenz, and (4) prior invention by others than Ittner. The learned court below, having awarded priority of invention to Ittner, neither discussed nor passed upon these assaults on the Lorenz patent and made no findings of fact or conclusions with respect thereto. Obviously, in the present state of the record, it is not possible for this court to pass upon the question of patentability which is directly in issue under the pleadings. The case must, therefore, go back for a retrial, following which the court below will make appropriate findings with respect to the factual objections interposed to the Lorenz patent and adjudicate accordingly. The power of the court to so proceed is free from doubt. The statute plainly provides that "the court, on notice to adverse parties, and other due proceedings had *according to the course of equity,* may adjudge and declare either or both of the [interfering] patents void in whole or in part, *upon any* ground * * *." (Emphasis supplied.) R.S. Sec. 4918, March 2, 1927, c. 273, § 12, 44 Stat. 1337, 35 U.S.C.A. § 66. The permissive aspect of the jurisdiction with respect to the extent of its exercise relates merely to the appropriateness of the adjudication under the proofs. In a case such as the present, where a decree of patent validity is prayed for and proofs are of-fered to show invalidity, it becomes the duty of the court to determine the issue. See Palmer Pneumatic Tire Co. v. Lozier, 6 Cir., 90 F. 732, 734, 736. This will be done according to the course of equity which, under the federal system, presupposes the finding of material facts by the trial Judge. Equity Rule 70½, 28 U.S.C.A. § 723 Appendix; Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following § 723c.

The right of a court under R. S., Sec. 4918, to declare either or both of two interfering patents invalid "upon any ground" seems to us to dispose adversely of the plaintiff's contention that the defendant is estopped from denying the validity of the Lorenz patent because of matter incident to or growing out of the interference proceeding in the Patent Office, where, incidentally, the question was originality of invention and not patent validity. Any possible estoppel of parties would be without relation to the court's power to declare a patent invalid upon sufficient showing or its duty to exercise such power in an appropriate case. See Hill v. Wooster, 132 U.S. 693, 698, 10 S.Ct. 228, 33 L.Ed. 502; and Christie v. Seybold, 6 Cir., 55 F. 69, 72. In any event, it would seem that, in a suit involving patent validity, the operation of the doctrine of estoppel could extend no further than to the private rights of the interested parties inter se, and certainly not to the right of (patent) monopoly in which the public has an interest. If the rule were otherwise, an appearance of patent validity might be procured through the collusive action of ostensibly adverse parties. Cf. Hill v. Wooster, supra, 132 U.S. at page 698, 10 S.Ct. 228, 33 L.Ed. 502. Over and above the defendant's private rights or lack of them, the defenses here alleged are material to the question of the Lorenz patent's validity which is directly in issue under the plaintiff's bill of complaint. They will, therefore, be considered by the court below to the extent which the proofs may warrant.

The judgment of the District Court is reversed and the case is remanded for further proceedings in conformity with this opinion.