### LORENZ et al. v. COLGATE-PALMOLIVE-PEET CO.

No. 5758.

District Court, D. New Jersey.

June 5, 1945.

Edward Maxson, of New York City (Malcolm Wilson, of White Plains, N. Y., and John Lane, of New York City, of counsel), for plaintiffs.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J. (Frank E. Barrows and Roger T. McLean, both of New York City, of counsel), for defendant.

SMITH, District Judge.

This is a civil action under Section 4918 of the Revised Statutes, 35 U.S.C.A. § 66, and is before this Court for retrial, having been remanded by the Circuit Court of Appeals for further proceedings in conformity with its opinion, 3 Cir., 122 F.2d 875. The history of this litigation is adequately summarized in the said opinion, and we shall therefore recount only those events necessary to a proper understanding of the only remaining issue.

Lorenz, one of the plaintiffs, having conceived a process for the manufacture of soap and the recovery of glycerine, filed his application for a patent thereon on January 24, 1920. The application was finally rejected by the Patent Office on November 22, 1927. Lorenz failed to respond to this action within the period prescribed by the statute, R.S. § 4894, 35 U.S.C.A. § 37, and on May 28, 1928, the said application was held to have been abandoned for want of prosecution.

Ittner, an employee of the defendant, having allegedly conceived a process for the manufacture of soap and the recovery of glycerine, filed his application for a patent thereon on February 19, 1931. The patent, No. 1,918,603, issued to the defendant, the assignee of Ittner, on July 18, 1933. Nineteen of the twenty-two claims of this patent embodied the disclosures of the Lorenz application.

Lorenz, upon learning of the Ittner patent, filed with the Commissioner of Patents a petition to revive his original application. This petition was denied. On November 8, 1934, more than a year after the issuance of the Ittner patent, Lorenz filed a new patent application in which he adopted as his claims the claims of the Ittner patent.

Thereafter, pursuant to the provisions of the statute and the rules of the Patent Office, an interference was declared and proceedings therein were duly instituted. The Examiner of Interferences, having determined that Lorenz was the original inventor of the process, awarded him priority of invention on the subject matter of nine-

teen of the twenty-two claims in issue. Patent No. 2,084,446, embracing nineteen claims, was issued to the plaintiffs on June 22, 1937. The present action followed.

The only issue presented for adjudication at this time, under the mandate of the Circuit Court of Appeals, is the issue of patent validity. It is asserted by the defendant, but controverted by the plaintiffs, that the Lorenz patent is invalid because of (1) prior public use, (2) anticipation by prior patents, (3) prior invention by others, and (4) abandonment of the invention.

## Lorenz Patent

The process of the patent is therein defined in claim 3, which is typical, as follows: "The process of making soap * * * and glycerine which consists in heating a mixture of low grade fat and a base to a *temperature in excess of the melting point of the resulting anhydrous soap* and thoroughly agitating the mixture *in an atmosphere free of air,* while intimately contacting the mixture *under diminished pressure* with a stream of water vapor." (Emphasis by the Court.) Claims 1, 6, 7, 11 and 14, quoted in the annexed appendix, are representative of the other claims, which embody nothing more than obvious modifications of the process as thus defined.

The invention, as defined in the quoted claim and described in the specification,[1] embodies several elements, new and old, in a novel combination. The essence of the invention, however, resides not only in the particular combination of elements but also in the novel concept of effecting the saponification of the fat under *reduced pressure* and at *high temperature* (a temperature in excess of the melting point of the resulting anhydrous soap—a temperature above 150° centigrade but preferably within the range of 250° and 270° centigrade), in an atmosphere *free of air.* The other elements of the invention, steam agitation of the mixture and vacuum distillation of the glycerine, were concededly old and well known in the art, but their embodiment in a unitary process for the manufacture of soap and the recovery of glycerine appears to be new.

It should be observed that in the practice of the earlier processes in common use, the saponification of the fat was effected under *atmospheric pressure* and at *moderate temperature* (a temperature below the melting point of anhydrous soap), in the *presence of air.* These processes were carried out in open kettles, and, it was generally recognized that in the presence of air high temperatures caused pyrolysis, or decomposition of the soap and glycerine. There were inherent in the earlier processes other disadvantages which affected the economy of manufacture, but it seems unnecessary to discuss them.

It is our opinion, predicated solely upon the present record, that the process of the patent, measured by the commonly accepted criteria, was an invention within the meaning of the statute. The saponification of fats and oils under the prescribed conditions was an improvement on the

---

[1] "Referring more particularly to the parts, and describing the process more fully, I may say that one method of carrying out my process is to mix the oil or fat with a suitable quantity of alkali dissolved in an appropriate quantity of water (or mixing the oil or fat with finely divided alkali more or less in the dry state) in an enclosed kettle or still connected with a condenser, condenser worm or coil (disposed within a condensing chamber in which the condensing operation is conducted in the usual way) and distillate receptacle or receiver, the whole being enclosed and forming a vacuum circuit. It is understood that the receiver is in turn connected by a pipe with a vacuum pump through the manipulation of which a vacuum may be maintained or produced in the system.

"Obviously the mixture of the oil or fat with the alkali can be made in a separate vat or tank by agitation or otherwise and then drawn into the retort or distilling chamber. The retort is now heated *in excess of 150° C., preferably up to 250° to 270° Centigrade,* in any suitable manner, with superheated steam coils, or otherwise, and *the Vacuum Pump put in operation.* The water, glycerine and a small percentage of volatile oil * * * will distill over, the soap formed remaining in the retort as a dry mass." *(Anhydrous* but *molten)* "During the cooling of the soap mass I have found it important not to admit any air into the retort, otherwise the soap will turn brown in color. To facilitate the distillation of the glycerine from the soap mixture, I may elect to pass steam preferably superheated, through the soap mixture in the retort. This operation will, of course, thoroughly agitate the mixture. The condensed water from the steam in this case will pass into the condensing receptacle that receives the glycerine and volatile oil." (Emphasis by the Court.)

earlier processes and a departure from the prior art. The invention, however, was not patentable because of its public use "more than two years prior to" the application for the patent.

## Statute

The defenses here urged against the validity of the patent rest on Section 4886 of the Revised Statutes, 35 U.S.C.A. § 31, which, at the time the patent issued, provided: "Any person who has invented or discovered any new and useful art, * * * or any new and useful improvements thereof, * * * *not known or used by others in this country*, before his invention or discovery thereof, and *not patented or described in any printed publication* in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and *not in public use* or on sale in this country *for more than two years prior to his application*, * * * may, * * * obtain a patent therefor." We have herein emphasized only the apposite provisions.

## Public Use

■ It clearly appears from the undisputed testimony and the documentary evidence offered in support thereof that the process of the patent was in public use in the factory of the defendant from November 1931 until November 1932, approximately one year, but more than two years prior to the Lorenz application of November 8, 1934. This use was preceded by several months of experimentation, but commercial production of soap and glycerine by the process of the patent was accomplished in November of 1931 and continued thereafter until 1932, when the use of the process was either discontinued or abandoned.

■ This public use, although it did not enrich the art, was sufficient under the statute to preclude the issuance of a valid patent. Electric Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071; Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141; Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755; Paraffine Cos. v. McEverlast, Inc., 9 Cir., 84 F.2d 335; Grasselli Chemical Co. v. National Aniline & Chemical Co., 2 Cir., 26 F.2d 305. The patent is therefore void for this reason, if for no other.

■ The plaintiffs contend that the use of the invention by the defendant was experimental. This contention, however, is *not supported by the evidence*. The public use of the invention having been established by competent and persuasive proof, the burden was on the plaintiffs to prove that it was experimental and not "public" within the meaning of the statute. Smith & Griggs Mfg. Co. v. Sprague, supra; Aerovox Corporation v. Polymet Mfg. Corporation, 2 Cir., 67 F.2d 860; Wendell v. American Laundry Machinery Co., 3 Cir., 248 F. 698, 699; Guy v. Stein, 7 Cir., 239 F. 729, 733; American Ballast Co. v. Davy Burnt Clay Ballast Co., 7 Cir., 220 F. 887, 889. The plaintiffs failed to sustain this burden.

■■ It must be noted that the public use of the invention was subsequent to the application of January 24, 1920, but prior to the application of November 8, 1934. This fact, however, is not a bar to the statutory defense here raised. The former application having been abandoned, the latter application may not be regarded as a continuation. U. S. Rifle & Cartridge Co. v. Whitney Arms Co., 118 U.S. 22, 6 S.Ct. 950, 30 L.Ed. 53; Rosenberg v. Carr Fastner Co., 2 Cir., 51 F.2d 1014, certiorari denied 284 U.S. 652, 52 S.Ct. 32, 76 L.Ed. 553; Detroit Iron & Steel Co. v. Carey, 6 Cir., 236 F. 924; Lay v. Indianapolis Brush & Broom Mfg. Co., 7 Cir., 120 F. 831. The public use sufficient to invalidate the patent must be computed from the date of the application upon which the patent issued. Ibid.

## Anticipation

■ The defendant rests the defense of anticipation on several foreign patents[2] and one domestic patent.[3] It is our opinion, after careful consideration of each of the cited references, that their respective disclosures are insufficient to sustain the defense. It is well established that a patent relied upon as an anticipation must be clear and unequivocal; it must disclose adequate directions for the practice of the invention and without resort to the patent in suit. Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F.2d 986; Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500; Southern Phosphate Corporation v. Phosphate Recovery Cor-

---

[2] Belgian Patent No. 6979; German Patent No. 559,632; German Patent No. 559,732; British Patent No. 380,707; and French Patent No. 731,307.

[3] West Patent No. 268,443.

poration, 3 Cir., 102 F.2d 801; American Safety Table Co. v. Singer Sewing Machine Co., 3 Cir., 95 F.2d 543; certiorari denied 305 U.S. 622, 59 S.Ct. 82, 83 L.Ed. 397; Worthington Mower Co. v. Gustin, 3 Cir., 80 F.2d 594, certiorari denied 297 U.S. 725, 56 S.Ct. 500, 80 L.Ed. 1008; Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427; Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463. None of the cited references meets this test.

### Prior Invention by Others

It is urged by the defendant that the invention of the patent in suit was disclosed in earlier patents, to wit, the Beck Patent No. 1,965,566; the Clayton Patent, No. 2,037,006; and the Schellmann Patent, No. 2,056,984. These patents do not disclose the invention of the patent in suit, although their respective inventions embody similar elements.

"A patent regularly issued, * * *, is presumed to be valid until the presumption has been overcome by convincing evidence of error. * * * Sometimes it is said that in a suit for infringement, when the defense is a prior invention, 'the burden of proof to make good this defense' is 'upon the party setting it up,' and 'every reasonable doubt should be resolved against him.' * * * Again it is said that 'the presumption of the validity of the patent is such that the defense of invention by another must be established by the clearest proof—perhaps beyond reasonable doubt.' Austin Machinery Co. v. Buckeye Traction Ditcher Co., 6 Cir., 13 F.2d 697, 700." Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 7, 55 S.Ct. 928, 931, 79 L.Ed. 163. The defendant has failed to sustain the burden of proof.

### Abandonment of Invention

It clearly appears from the evidence that the plaintiff Lorenz, although he abandoned his original application, did not abandon his invention.

### Additional Claims

Claims 16 and 17 cover a "process of separating glycerine from a mixture of soap and glycerine." The process is described in claim 17 as follows: "The process of separating glycerine from a mixture of soap and glycerine which consists in heating said mixture uniformly without local overheating to a temperature producing an appreciable vapor pressure of glycerine, thoroughly agitating said mixture, excluding air, intimately contacting said mixture with a stream of water vapor, and removing the resulting mixed vapor of water and glycerine and condensing the same while carrying on the whole at diminished pressure." These claims are void because of anticipation by and lack of invention over the prior art.

### Conclusion

The patent in suit, No. 2,084,446, is void for the reasons herein stated.

### Appendix

"1. The process of making soap and glycerine which consists in heating a mixture of fat and a base to a temperature in excess of the melting point of the resulting anhydrous soap and thoroughly agitating the mixture in an atmosphere free of air while intimately contacting the mixture with a stream of water vapor."

"6. The process of completely saponifying fat and of separating the resulting glycerine in vapor form from the soap which comprises uniformly heating a mixture of fat and an alkaline medium to a temperature in excess of the melting point of the resulting anhydrous soap while contacting the said mixture with a stream of water vapor at low pressure, excluding air, and condensing the glycerine."

"7. The process of completely saponifying fat and of separating the resulting glycerine in vapor form from the soap which comprises uniformly heating a mixture of fat and an alkaline medium to a temperature above 150 degrees C. while contacting the said mixture with a stream of water vapor at low pressure, excluding air, and condensing the glycerine."

"11. The process for the manufacture of soap and glycerine consisting in the treatment of fats or fatty oils with an alkaline medium sufficient to effect saponification, the subjection of the composition thus formed to heat, without local overheating, to a temperature in excess of 200 degrees C., with the aid of agitation, with the exclusion of air, with a current of steam, in a closed vessel with the aid of diminished pressure for the volatilization and recovery of the glycerine produced, and for the volatilization and removal of volatile impurities."

"14. The process of saponifying esters of fatty acids to produce soap and alcohol

and of separating the resulting alcohol in vapor form from the soap, which comprises uniformly heating the mixture of esters of fatty acids and an alkaline medium to a temperature in excess of the melting point of the resulting anhydrous soap while contacting said mixture with a stream of water vapor at low pressure, excluding air, thoroughly agitating the whole, and condensing the alcohol so formed."