**MARVIN GLASS & ASSOCIATES**
v.
**SEARS, ROEBUCK & COMPANY.**
Civ. A. No. 68–H–516.

United States District Court,
S. D. Texas,
Houston Division.
July 30, 1970.

Tom Arnold, Arnold, Roylance, Kruger & Durkee, Houston, Tex., for plaintiff.

Joseph Jaworski, Bracewell & Patterson, Houston, Tex., for defendant.

SINGLETON, District Judge.

This is a patent case. United States Letters Patent No. 3,086,297 was issued for a "talking book." Plaintiff, Marvin Glass & Associates, an Illinois partnership, is the owner of the patent. In August of 1967, plaintiff purchased the patent in suit from the inventor, Mrs. Louise A. Kay, for $17,500.00. Mattel, Inc., manufactures a "talking book" under the name "See 'N Say" talking story books. Mattel, Inc., a California corporation, was originally named as a defendant in this suit, but the complaint was dismissed as to Mattel for lack of venue. The remaining defendant, Sears, Roebuck & Company is a New York corporation licensed to do business in this District, is actually doing business in this District, and has a regular and established place of business within this District. Sears has sold the Mattel device within the District. This Court has venue under 28 U.S.C. § 1400 (1962).

Plaintiff brings this suit alleging that the Mattel device sold by Sears infringes claims one, two, three, and nine of its patent. As is often the case in patent suits, defendant raises a multitude of defensive issues. Defendant claims that the "invention" was anticipated by a prior patent, that it appeared in a prior printed publication, that it was in prior public use or sale by the inventor, that the inventor abandoned the invention, and that the inventor did not invent the subject matter of the patent in suit. Further, defendant claims that the patent is invalid for the "obviousness" of the difference between its subject matter and the prior art. In addition, defendant attacks the patented device as being inoperative; lacking in any commercialization; and, having an improper supplemental oath executed by the inventor. Finally, defendant denies that its device infringes the claims of the patent in suit.

Essentially, a "talking book" is a combination of a book and a sound-reproducing mechanism with some means of correlating the visual intelligence written on the pages of the book with the audio intelligence recorded on a sound track. Both the patented device and the accused device embody this basic concept.

*Factual Background.* Sometime in 1953 Mrs. Louise A. Kay invented the subject matter of the patent in suit. Mrs. Kay worked as a bookkeeper and was required to leave her child in the care of others. She sought to invent a

talking book to both educate and entertain her child. Mrs. Kay, by her own admission, was no engineering genius. She could only implement her idea for a talking book through a process of trial and error. She purchased several electric motors, batteries, and an erector set. She constructed a turntable out of a piece of wood. She made her own recording of various nursery rhymes. After many unsuccessful attempts, she developed a device which would correlate the recorded message with the visual message and which would stop the turntable at the end of each message.

Mrs. Kay was never completely satisfied with the finished device. She felt that the recording she had made herself was not of the best quality. She occasionally would put the batteries in backward and the turntable would rotate in the wrong direction. However, all these minor difficulties aside, there is no doubt that the device worked.

Mrs. Kay saw the potential of her "invention" and sought out a firm of patent attorneys to aid her in preparing a patent application. She took her device to her attorney, Mr. Byrne. She demonstrated it for him and it operated successfully. Mr. Byrne gave the model to his draftsman. The drawings and specifications which were later placed in the patent application were made at this time from Mrs. Kay's model.

On November 17, 1953, Mrs. Kay's patent application was filed and the procedure leading to the issuance of Letters Patent was commenced. However, all was not clear sailing for Mrs. Kay. On April 19, 1955 her attorneys withdrew from prosecution of the original application, because a check from Mrs. Kay to her attorneys was returned for insufficient funds. On being advised by her attorneys that they were withdrawing from the case, Mrs. Kay called them and was given the impression that they would take care of her application.

Mrs. Kay's attorneys did not file an answer to an office action dated December 7, 1956, and since the inventor, Mrs. Kay, did not know an answer was due, the application became abandoned as of June 7, 1957, without Mrs. Kay's knowledge.

Sometime between the filing of the first application and the filing of the second application, Mrs. Kay tried to license her invention to the Radio Corporation of America and the Harris Group in an attempt to have these organizations promote her invention. Later, in the summer of 1961, Mrs. Kay approached Viewlex, Inc., in an attempt to license her invention under a patent which she thought all along that she had. Mrs. Kay was informed by the patent attorney for Viewlex that she did not have a patent and that her original application had lapsed. Not until that time was Mrs. Kay aware that she did not have a patent on her talking book. On August 21, 1961, a new application was filed as a substitute for the original application, which new application issued as the patent in suit on April 23, 1963. Mrs. Kay's negotiations with Viewlex resulted in an option agreement dated November 7, 1961, and a license agreement dated September 28, 1962. Mrs. Kay's patent application remained secret in the Patent Office. Mattel's talking book did not come on the market until five years after Mrs. Kay's patent issued.

On or about May 1, 1967, plaintiff, Marvin Glass & Associates, began the development of a talking book, which included a book having a plurality of pages, with a record-type sound reproducing apparatus designed to reproduce the intelligence on the pages of the book. In August of 1967 in the course of the state of the art search of educational devices in the Patent Office, plaintiff became aware of the patent in suit and after a study thereof, plaintiff purchased the patent from Mrs. Kay for $17,500.00.

*The Patented Device.* In order to facilitate subsequent discussion, it is appropriate at this point to set forth, in layman's terms, what this Court understands to be the device depicted in the drawings and specifications of the Kay patent and the mode of operation of that device.

April 23, 1963

LOUISE A. KANTROWITZ
NOW BY CHANGE OF NAME
LOUISE A. KAY
TALKING BOOK

3,086,297

Filed Aug. 21, 1961

4 Sheets—Sheet 1

Fig. 1.

Fig. 2.

INVENTOR.
LOUISE. A. KANTROWITZ

[A2880]

Figure 1. The Patented Device.

The Kay device is housed in what can best be described as a suitcase. Inside, there is a holder in which a book is placed. Along the right-hand edge of the right-hand page of the book there is an index, namely, an arrow. On the first pair of pages, the arrow is near the top of the right-hand page along the right edge. With each succeeding pair of pages the arrow is placed somewhat lower along the edge of the right-hand page.

Adjacent to the right-hand edge of the open book but somewhat below it, there is a slot in the side of the casing on which the book rests. This slot runs the full length of the right edge of the open book. The bottom of the slot is notched at regular intervals. Protruding from the slot is a lever with an arrow imprinted on it. By matching the arrow on the lever with the arrow on the page of the book, the appropriate audio message is selected. This lever in the Kay device is the single control whereby the mechanism housed beneath the book is operated. This lever both selects the message and turns on the power to operate the device.

Inside of the casing is a turntable which is connected to an electric motor by means of a pulley. On the turntable is a standard disc record with a sound track recorded in a single groove, which starts at the outer periphery of the record and proceeds spirally toward the center of the record.

The control lever is connected to a pickup needle so that when the lever is shifted the pick-up needle is moved laterally between the outside edge and the center of the record. Messages are recorded at spaced intervals on the record. The messages are separated by blank portions of the sound track. Thus, by positioning the control lever in a particular notch, the pickup needle is positioned above a specific message.

At the opposite end of the arm to which the pick-up needle is affixed is another needle. This needle makes contact with an exposed copper wire, thus completing the electrical circuit between the batteries and the electric motor which powers the turntable. The aforementioned copper wire is insulated at spaced intervals. Thus, when the pick-up needle traverses a particular message on the record, the opposite end of the arm to which the needle is affixed traverses a certain length of the copper wire and reaches an insulated portion thereof. Thus, at the end of a message the circuit is broken and the turntable comes to a halt. The pick-up needle remains resting in the groove of the record at that point.

To hear another message, all one must do is lift the control lever out of the notch in which it is resting. By lifting the control lever the pick-up needle is raised from the groove of the record and is returned by a "lost motion" connection to its starting position. The same message may be replayed simply by placing the lever into the same notch or a new message selected by turning the page, matching the arrows, and allowing the lever to drop into the corresponding notch.

[A2879]    Figure 2.   The Accused Device.

*The Accused Device.* The Mattel device is basically a book with the sound-reproducing mechanism housed in a casing beneath the book. A circular hole is cut through all the pages of the book. On each right-hand page of the book an arrow is placed on the edge of the circle made by the hole. On each page the arrow is placed in a different position. Protruding up through the hole is a round knob. On the knob is imprinted an arrow. By matching the arrow on

the knob with the arrow on the page, the appropriate message is selected. On the side of the casing that runs below the right edge of the book is a small hole, through which a string runs. Connected to the end of the string outside the casing is a plastic ring, which is larger than the hole in the casing.

Inside the casing, the string runs through a hole in the device which holds the record needle. The record needle has a small sound cone above it and is biased down toward the record. The string, after passing through the needle device, winds around a spindle. There is also a turntable which is rotated by means of a spring.

The record in the accused device is a disc-type record, but it differs from the standard record, with which most people are familiar. The messages are not recorded on a continuous spiral groove, but rather each message is recorded on a separate groove that starts at the outer edge of the record and proceeds spirally to the point nearest the center of the record where the groove ends. Thus, the several messages are recorded on spirally interleaved grooves. Each message begins at the edge of the record and proceeds toward the center.

When the index knob, which protrudes through the hole in the book, is rotated the disc record is rotated, thus rotating a particular message on the edge of the record to a fixed point within the mechanism. In this manner the message is selected.

The next step is to pull the string that protrudes through the small hole in the side of the casing. This positions the record needle above the outer edge of the

record and winds the spring which moves the turntable. Although the record needle is biased downward toward the record, when the string is under tension it overcomes the downward bias of the needle and keeps it suspended above the record. When the string is held fully extended from the casing it is under such tension. But when the string is released, there is no tension on the string. Thus, the needle drops into the record groove. In a like manner, the absence of tension on the string allows the spring to unwind and thereby rotate the turntable, while at the same time the string is wound back onto the spindle.

When the ring which is attached to the end of the string reaches the small hole, it hits up against the casing, causing tension to once again be placed upon the string, lifting the record needle from the record and stopping the further unwinding of the spring. But, in the interim, while the string is being wound onto the spindle, the needle has traversed the full length of the message from the edge of the record to the point near the center. The message has been played. The needle hangs suspended above the record, allowing the disc to freely rotate. Thus, another message can be selected. As the string is again pulled it slides the needle back out to the outer edge of the record. And the process begins again.

## I. VALIDITY.[1]

■■■ In general, in any action in which the validity of a patent is attacked, there is a strong presumption of the validity of a patent that has survived the scrutiny of the Patent Office. 35 U.S.C.

1. It has been suggested that the Court could dispose of this case on the issue of infringement alone. However, the better practice is to inquire fully into validity. See Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, No. 27412 (5th Cir. April 14, 1970) ; Up-Right, Inc. v. Safeway Prods., Inc., 315 F.2d 23 (5th Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963).

"There has been a tendency among lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent * * *. It has come to be recognized, however, that of the two questions, validity has the greater public importance." Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

§ 282 (1964); Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453 (1934); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, No. 27412 (5th Cir., April 14, 1970). The rule is that the burden of establishing the invalidity of a patent shall rest on the party asserting it and that any reasonable doubt will be resolved against him. 35 U.S.C. § 282 (1964); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916); Cameron Iron Works v. Stekoll, 242 F.2d 17 (5th Cir. 1957).

The Kay patent can fairly be described as a combination patent, in that many of its elements have been used before. However, it is well-settled that: "A combination whether composed of all old, or some old and some new elements, is patentable if it achieves an altogether new and useful result." Bryan v. Sid W. Richardson, Inc., 254 F.2d 191, 194 (5th Cir.), cert. denied, 358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57 (1958). See Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Williams Bit & Tool Co. v. Christensen Diamond Prods. Co., 399 F.2d 628 (5th Cir. 1968); Foster Cathead Co. v. Hasha, 382 F.2d 761 (5th Cir. 1967); Samuelson v. Bethlehem Steel Co., 323 F.2d 944 (5th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

The three tests of patent validity are utility, novelty, and non-obviousness. 35 U.S.C. §§ 101, 102 and 103 (1954); Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965);

Beckman Instruments, Inc. v. Chemtronics, Inc., *supra.*

■ *Utility.*[2] Utility, in terms of patent law, means that the device revealed by the patent is capable of performing some beneficial function claimed for it. Smith v. Nichols, 21 Wall. (88 U.S.) 112, 22 L.Ed. 566 (1875); Seymour v. Osborne, 11 Wall. (75 U.S.) 516, 20 L.Ed. 33 (1871); A. W. Deller, Walker on Patents, § 86 (2d ed. 1964) [hereinafter referred to as Deller]. A patent is prima facie evidence of utility. Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 F. 856 (4th Cir. 1901).

■ Initially, defendant seeks to negate the Kay patent's claim of utility by alleging that the device set forth in the drawings and specifications of the Kay patent will not operate. There is no doubt that a device which is inoperative lacks utility and, therefore, lacks an essential element of patentability. Coupe v. Royer, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895); Deller § 95. Defendant relies exclusively on the testimony of its expert witness in support of its claim of inoperativeness. This witness, in effect, testified that when the laws of physics were applied to the device revealed by the drawings and specifications of the Kay patent, one must conclude that the device will not work. For example, he testified that the manual control lever depicted in the Kay patent would not raise the pick-up needle from the groove in the record. This conclusion was based on the proportionate width of the slot through which the lever protrudes, the length of the lever, the physical properties of the metal from which the lever was constructed, the point at which the lever was pivoted, the type of connection employed to link the pick-up head with the lever, and the downward bias of the pick-up head. All of these factors combined to lead the

---

2. 35 U.S.C. § 101 provides:
   "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

witness to the conclusion that the control lever could not, within the confines of the slot, generate enough lifting power to raise the pick-up needle.

This conclusion was reached by applying calculations to the schematic drawings of the Kay device. Defendant built no model to demonstrate the accuracy of its calculations. On the other hand, plaintiff's expert, a man, who, unlike defendant's expert, has considerable experience in designing toys, testified that the device would work and that he could make it from the drawings and specifications.[3] Finally, there is the testimony of Mrs. Kay and of Mr. Byrne that the device actually did work.

Defendant has not met its burden of proving that the device shown in the patent is inoperable. Crown Cork & Seal Co. v. Aluminum Stopper Co., *supra;* Kamborian v. United Shoe Machinery Corp., 73 F.Supp. 548 (D.Mass.1947), aff'd, 169 F.2d 249 (2nd Cir.), cert. denied, 335 U.S. 885, 69 S.Ct. 237, 93 L. Ed. 424 (1948).

*Novelty.*[4] "To be novel, an invention must not have been anticipated by prior knowledge or use, a prior patent, a prior publication, prior public use or prior sale." Deller § 58 at 245. Essentially a device lacks novelty if there has been a substantially identical prior device.

"Section 102, which pertains to novelty, requires that the patentee be the original inventor of the object claimed in his patent, and also that the invention not have been known or used by others before his discovery of it. Thus one obviously cannot be the original inventor if someone else has described or used the subject matter of the claims before the earliest moment to which he can trace his invention." Beckman Instruments, Inc. v. Chemtronics, Inc., *supra,* 428 F.2d at 561.

A patented invention cannot be invalidated piecemeal under section 102 by finding individual features separately in the prior art. Imhauser v. Buerk, 101

---

3. The transcript erroneously indicates that plaintiff's expert testified that the patented device would not work. The Court's memory and a tape recording indicated otherwise. Both sides were allowed to listen to the Court's tape and satisfy themselves that the witness had testified that the device would work. However, Plaintiff's expert conceded that the patented device would require a great deal of engineering and testing before it would be commercially marketable.

    "It is not necessary in order to sustain a patent that an invention be commercially successful. The device patented may be imperfect in its operation, but it is sufficient if it embodies the generic principle and works, that is, if it actually and mechanically performs, even though only in a crude way." Deller § 87 at 499 and cases cited therein.

4. 35 U.S.C. § 102, in pertinent part, provides:

    "A person shall be entitled to a patent unless—

    "(a) the invention was known or used by others in this country, or patented, or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent, or

    "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for a patent in the United States, or

    "(c) he has abandoned the invention, or

       *     *     *     *     *

    "(e) the invention was described in a patent granted or an application for a patent by another filed in the United States before the invention thereof by the applicant for a patent, or

    "(f) he did not himself invent the subject matter sought to be patented, or

    "(g) before the applicant's invention thereof, the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

U.S. 647, 25 L.Ed. 945 (1880); Firestone v. Aluminum Co. of America, 285 F.2d 928 (6th Cir. 1960).

Although defendant cites many references as prior art for the Kay patent, it only claims that one reference fully anticipates the patent in suit. Defendant claims that the Kay patent was anticipated by a device invented by A. L. Runyan and for which a patent was issued in 1933. The court cannot agree with this conclusion. Upon comparing the Runyan device with the Kay patent, one is immediately struck with the simplicity of the Kay invention. Simplicity is the genius of the Kay invention. The Kay invention was designed for pre-school children. Simplicity, ease of operation, and durability are its main assets.

The Runyan patent revealed two embodiments. In the first embodiment the mechanism which selects the audio message is separated from the book, and the user must be able to read in order to correlate the selector to information on the page. In the other embodiment no book is suggested at all; and in both Runyan embodiments the index can be correctly set, and the wrong information be read—a defect not found in the Kay patent. Admittedly, many elements of the claims of the Kay patent can be read on the Runyan devices, but when the claims of the Kay patent are construed in light of the drawings and specifications of that patent, the differences between Kay and Runyan become readily apparent.

In addition, this court's finding that the Runyan patent does not show the Kay invention, is bolstered by the fact that the Runyan patent was cited by the Patent Office during the prosecution of Mrs. Kay's first application. Both Mrs. Kay's first and second application were handled in the same division of the Patent Office; the second application clearly refers to the first application; the drawings were transferred from the first to the second application; and the same Primary Examiner handled both. Significant portions of the only Office Action in the second application were copied verbatim from the Office Action which cited Runyan in the first application. Claims one and two of the Kay patent, as issued, were in the first Kay application and the Examiner cited the Runyan patent, and in that Office Action the Examiner found claims one and two patentable. Thus, the Court must conclude that the Patent Office had the Runyan patent before it when it examined Mrs. Kay's application and it determined that the patent claims were patentable over Runyan.

Obviously, when the most pertinent prior art reference cited against the patent in suit has been considered and rejected by the Patent Office, the presumption in favor of the validity of the patent is enhanced. Jeoffroy Mfg. Co. v. Graham, 219 F.2d 511 (5th Cir. 1955), cert. denied, 350 U.S. 826, 76 S.Ct. 55, 100 L.Ed. 738 (1956); Parker v. Brown & Root, 198 F.Supp. 795 (S.D.Tex.1961).

Ancillary to its claim of anticipation by Runyan, defendant makes several other challenges to the validity of the Kay patent. Defendant contends that the Runyan patent constitutes a prior printed publication as would invalidate the Kay patent under 35 U.S.C. § 102(b). Of course, the court's determination that the Runyan patent did not anticipate the Kay patent, disposes of this contention.

Defendant also contends under 35 U.S.C. § 102(f) that Mrs. Kay was not the inventor of the subject matter of the Kay patent. The essence of this contention is that the drawings and specifications of the patent application were the product of the imagination and skill of attorney Byrne's draftsman, not of Mrs. Kay. While Mrs. Kay constructed something, says defendant, what she constructed bears no resemblance to the drawings of the patent. In the face of this contention, there is testimony of Mrs. Kay and of attorney Byrne that the drawings did accurately reflect the Kay invention. Defendant simply has not sustained its burden on this issue.

*Non-obviousness.*[5]

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deer Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Thus, in deciding the question of nonobviousness a court must: (1) determine what the prior art was; (2) define the distinctions between the prior art and the patented invention; and (3) decide whether the improvements over the prior art, if any, would have been obvious to one skilled in the art at the time of the invention. See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435 (W.D.Mich. 1969).

Defendant initially cited 32 prior art patents to show the invalidity of the Kay patent. Twelve of these patents were specifically applied against the Kay claims during the testimony of defendan's expert witness. These were: Runyan patent No. 1,930,286; Wise patent No. 2,323,638; Mallina patent No. 2,-977,125; Erdus patent No. 2,650,097; Samuels patent No. 2,546,680; Gabrielson patent No. 3,220,126; Kallman patent No. 2,369,572; Hicks patent No. 2,-822,425; Baller patent No. 2,689,751; Sines patent No. 2,917,325; Raschick patent No. 1,619,089; and Patz patent No. 2,570,976.

The differences between Runyan and Kay were discussed earlier. Mallina, which was cited by the Patent Office, cannot read the pages of a book as does the Kay device, and has no means to stop the record at the end of each part nor means to simultaneously start the record as required in the Kay patent claims. Mallina does not show or suggest the Kay invention.

Wise was the principal reference relied on by the Patent Office in both applications and was the reference over which all of the claims were allowed. In two separate examinations of the Kay invention, the Patent Office decided that the claims were patentable over Wise. Though Samuels was not cited by the Patent Office, it does not show the Kay invention. It would not have been obvious to make the Kay invention in view of Samuels because Samuels does not show a movable control member, nor manipulative means, nor settable means, nor an indexing means, either on the pages or on the control member. Likewise, it would not have been obvious to make the Kay invention in view of Sines because Sines does not even relate to a talking book.

Defendant does not claim that any of the above patents, other than Runyan, anticipates the Kay invention. However, defendant's expert prepared an elaborate comparison pinpointing, in a piecemeal fashion, various elements of the Kay patent in different prior art devices. Since Kay is a combination patent, it is not unreasonable to expect that the elements of Kay could be found in the prior art. But there is no such thing as cumulative anticipation. The true test here is one of non-obviousness. Plaintiff's expert, a man of ordinary skill in the art, testified that the prior art patents cited by defendant do not show the Kay invention, nor would the Kay invention have been obvious to him in view of that prior art. The Court, after reviewing the prior art, accepts and relies on this testimony in determining the issue of non-obviousness, adversely to defendant.

5. 35 U.S.C. § 103 provides:
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

*Abandonment and Forfeiture.* "Abandonment of an invention may be actual, or it may be constructive. It is actual when it is the result of intention. It is constructive when it is the result of some statute which operates regardless of the intention of the inventor." Deller § 129 at 640 (Footnotes omitted). Defendant raises the defenses of both constructive and actual abandonment.[6] Defendant alleges that the Kay patent was constructively abandoned in that the Kay model was "in public use, or on sale in this country more than one year prior to" August 21, 1961, the date of the application for the Kay patent in suit. See 35 U.S.C. § 102(b) (1954).

▆▆▆▆ Plaintiff concedes in its brief that Mrs. Kay's first application was abandoned. The abandonment of a patent application is not synonymous with abandonment of the invention.

"However, the abandonment of a patent application destroys the continuity of the procedure to obtain a patent for an invention. After abandonment has occurred, a subsequent patent application may be filed but it institutes a new proceeding and the statutory bars including public use or sale must be reckoned from the date of the filing of the subsequent application."

Deller § 130 at 643.

See Rosenberg v. Carr Fastener Co., 51 F.2d 1014 (2nd Cir.), cert. denied, 284 U.S. 652, 52 S.Ct. 32, 76 L.Ed. 553 (1931); Hayes-Young Tie Plate Co. v. St. Louis Transit Co., 137 F. 80 (8th Cir.), cert. denied, 199 U.S. 609, 26 S.Ct. 750, 50 L.Ed. 332 (1905); Lorenz v. Colgate-Palmolive-Peet Co., 60 F.Supp. 824 (D.N.J.1945), aff'd, 167 F.2d 423 (3rd Cir. 1948). Thus, with regard to the statutory bar to the placing of an invention on sale more than one year prior to the date of the application, the date of the second Kay application is controlling. Defendant contends that Mrs. Kay's negotiations with the Harris group and with RCA were more than a year prior to the second application and that the negotiations constituted a placing "on sale" under section 102(b).

"The purpose of the 'on sale' provision of the statute is to prevent an inventor from having the advantage of a monopoly for more than the statutory period by engaging in the competitive exploitation of his invention after it is fully developed before applying for a patent." Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp., 316 F.2d 459, 465 (9th Cir.), cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963).

See Koehring v. National Automatic Tool Co., 362 F.2d 100 (7th Cir. 1966).

▆▆▆▆ "[A] public use or sale by the inventor himself for more than a year before he files his application * * * is ipso facto an abandonment." Picard v. United Aircraft Corp., 128 F.2d 632, 635 (2nd Cir.), cert. denied, 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942). There is no requirement that the inventor must intend to abandon his invention. Perhaps since section 102(b)

---

6. Defendant raises several other defenses. Defendant contends that the facts of the present case support the imposition of three different types of estoppel against plaintiff. They are: (1) estoppel by secretion and suppression; (2) estoppel by intervening rights; (3) estoppel by misrepresentation to the Patent Office. This Court's view of the facts, set forth in the section on abandonment, negates defendant's contention of estoppel by secretion and suppression. On the issue of estoppel by intervening right, the Court's determination of non-infringement (see section on Infringement, infra) makes a determination of this issue unnecessary. As to the final estoppel contention, the evidence does not support defendant's contention that Mrs. Kay's attorney intentionally misled the Patent Office as to the existence of the Runyan patent. Defendant also contends that Mrs. Kay failed to file a proper supplemental oath and that this rendered the patent invalid. The impropriety of the oath stems from the fact that Mrs. Kay allegedly did not read the oath before signing it. The record does not support this contention. (See Transcript, pp. 430–432.)

can lead to fairly harsh results, courts have imposed a rather stringent burden of proof upon parties asserting it as a defense. See Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 409 F.2d 99 (6th Cir. 1969) ("clear and convincing"); Southern Implement Mfg. Co. v. McLemore, 350 F.2d 244 (5th Cir. 1965) ("clear and satisfactory"); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966) ("clear, cogent, and satisfactory proof to remove all reasonable doubt").

The only source of evidence on the "on sale" issue is the testimony of the inventor Mrs. Kay. She testified to the negotiations with the Harris group and RCA. At the time her testimony was taken, Mrs. Kay could not recall when the negotiations had taken place. Defendant provides no hard evidence to pinpoint the date of these negotiations. They obviously occurred in the period of time between the two patent applications. Conceivably the negotiations could have taken place within one year prior to the filing of the second patent application. Defendant has not met the heavy burden of proof required of it on this issue.

Even if the Court were to assume that the negotiations in question took place beyond the one year limit, there still remains the question of whether these negotiations amount to "on sale" activity of a type envisioned by section 102(b).

In Amerio Contact Plate Freezers, Inc. v. Belt Ice Corp., 316 F.2d 459 (9th Cir.), cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963), the only product existing at the time of the negotiations was a model and no contract for sale had been consummated. The Court held that the patented product was not "on sale," saying:

"[S]elling activity (at least activity short of actual sales) prior to the time that a fully-operative article or apparatus incorporating the invention comes into existence, is not a reliable indicium of competitive exploitation.

Until at least an operative prototype has been completed and tested, the competitive effectiveness of such activity in all probability, will be impaired by the aura of continuing developmental, experimental and testing effort. *Moreover, at this stage, such activity is likely to be more for the purpose of eliciting needed changes in design and testing whether the market potential warrants continuance of the project than to launch full-fledged commercial exploitation.*" Id. at 465 (Emphasis added.)

Although operative, the Kay model was not a finished product. A great deal of engineering and refinement would be necessary to make it commercially marketable.[7] Mrs. Kay, as an individual, did not have the wherewithal to adequately develop her invention. Her negotiations with the Harris group and RCA could be explained in terms of developing her invention. Admittedly, Mrs. Kay, a layman, used the term "sell," but no contract for sale was ever consummated. The negotiations of which she spoke appear to have been of a very preliminary nature. Whether their purpose was for the development of her invention or predominantly for commercial exploitation is not clear. Mrs. Kay testified before this Court by deposition only. Perhaps the question could have been further developed, if she had been a "live" witness. Defendant, who bears a substantial burden, must pay for the niggardliness of the record on this issue.

■■■ Defendant also raises the defenses of actual abandonment under section 102(c) and of forfeiture. Abandonment and forfeiture are related, but different defenses. Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2nd Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946). Abandonment is a deliberate dedication of the invention to the public, either expressly or by necessary implication. Deller § 129. Forfeiture, on the other hand, results from

---

7. See note 3, *supra.*

the deliberate withholding of the invention from the public with the intent of extending the duration of the patent monopoly. Woodbridge v. United States, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923); Levinson v. Nordskog Co., 301 F.Supp. 589 (D.Cal.1969). Thus, both abandonment and forfeiture are founded upon the intent of the inventor, either express or implied. The facts of the present case do not warrant a finding of either abandonment or forfeiture. Mrs. Kay applied for a patent the very year she invented her device. None of her actions are consistent with an intent to dedicate her device to the public. Mrs. Kay's actions belie even an intent to abandon her application, much less her invention. Her problems stemmed from a misunderstanding with her attorney. By this same token, her actions do not indicate a designed delay in an effort to extend her patent monopoly. She did not deliberately withhold her invention from the public and thereby forfeit the right to her invention. Foster v. Magnetic Heating Corp., 297 F.Supp. 512 (S.D.N.Y. 1968), aff'd, 410 F.2d 12 (2nd Cir.), cert. denied, 396 U.S. 828, 90 S.Ct. 82, 24 L.Ed.2d 80 (1969).

## II. INFRINGEMENT.

■ The burden of proving patent infringement in this case is on the plaintiff. United States Rubber Co. v. General Tire & Rubber Co., 128 F.2d 104 (6th Cir. 1942).

■ The patent claim is the measure of the grant, McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800 (1891), and is the point of initial inquiry into the question of infringement. The claims are the measure of the invention, they are not interpreted liter-

ally in *in vacuo*, but rather in light of the specifications of the patent disclosure. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938); Williams Bit & Tool Co. v. Christensen Diamond Prods. Co., 399 F.2d 628 (5th Cir. 1968).

> "When the claim with this language in it is construed in light of the disclosures of the patent, *it does not grant a monopoly on every means or mode by which that result could be achieved*. As the Act phrases it, these are confined to corresponding structures or acts described in the specification and equivalents thereof." Bryan v. Sid W. Richardson, Inc., 254 F.2d 191, 195 (5th Cir.), cert. denied, 358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57 (1958) (emphasis added).

■ A patent is not limited, however, to the particular embodiment of the invention shown and described in the specifications. Up-Right, Inc. v. Safeway Prods., Inc., 315 F.2d 23 (5th Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). Courts have used the doctrine of equivalents to extend the protection of the patent to an equivalent device which "performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

■ The range of equivalents granted a particular patent may be either broad or narrow depending upon the scope of the patent in suit. In determining the scope of a patent, courts consider such things as the state of the art into which the patent came, the language of the patent, and the proceedings in the Patent Office.[8] General Motors Corp. v.

---

8. Defendant, pointing to its lack of commercialization, seeks to append the label "paper patent" to the Kay patent, and thereby restrict its scope. "The issue of 'paper patent' may appear either as a challenge to validity * * * or as a legal reason for constriction of the scope of the patent * * *. In either case *disuse is ineffective unless chargeable to the owner of the patent* * * *. Wheth-

er the owner is so chargeable is a fact matter." General Motor Corp. v. Kesling, 164 F.2d 824, 828 (8th Cir. 1947), cert. denied, 333 U.S. 855, 68 S.Ct. 732, 92 L.Ed. 1135 (1948) (emphasis added). Neither Mrs. Kay nor Marvin Glass & Associates manufacture toys. They have both made efforts to develop the invention. The fact that it has not as yet been commercialized is not chargeable to them.

Kesling, 164 F.2d 824 (8th Cir. 1947), cert. denied, 333 U.S. 855, 68 S.Ct. 732, 92 L.Ed. 1135 (1948). For instance, if the patent in suit is a pioneer patent in a new field, it may be entitled to a broad range of equivalents. Whereas a narrow improvement patent which comes into a field in which there are many prior art devices would be entitled to a narrow range of equivalents. Where the claims of the patent in suit must be given a very narrow reading to insure its validity over the prior art, this same narrow reading governs to test infringement. Hazeltine Corp. v. Emerson Television-Radio, Inc., 129 F.2d 580 (2nd Cir. 1942); Herz Straw Co. v. Smith, 52 F.2d 32 (2nd Cir. 1931).

The doctrine of equivalents is a two-edged sword. Not only does the doctrine extend the protection of a patent to equivalent devices, but it also sets the outside limits beyond which there can be no infringement, regardless of the breadth of the claims. In the *Graver Tank* case, which is often cited for the broadening effect of the doctrine of equivalents, the court also said: "[W]here a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement." 339 U.S. at 608, 70 S.Ct. at 856. See Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

"Moreover, this is true regardless of the prior art. That is even though the patentee may have developed a broad novel concept, a new function, done a thing never before done, yet he cannot patent all ways of doing the thing, even though he was the first to do it." Foster Cathead Co. v. Hasha, 382 F.2d 761, 765 (5th Cir. 1967).

Regardless of the scope to be attributed to the claims of the Kay patent, and regardless of whether those claims literally read upon the accused device, this Court is convinced that the accused device does not infringe the Kay patent. The doctrine of equivalents operates to restrict the claims of the Kay patent to some point short of the accused device, because, although the accused device accomplishes the same result, it does so by employing substantially different means and substantially different modes of operation.

In addition, several factors operate to restrict the breadth of the Kay claims to a point short of the accused device. The Kay patent is for a combination composed of elements old in the art. It exists in a field crowded with prior art devices. While the Kay device represents patentable advance over the prior art, its claims must be narrowed in light of the disclosures of the patent in order to escape being rendered invalid by the prior art.

Moreover, the claims of the Kay patent are couched in broad terms.[9] Many elements of the claims are written in what can best be described as a functional language. They claim only "means" for accomplishing a particular result and do not specify the "means" with particularity. The Patent Act expressly allows the use of such language in the claims for a combination patent. 35 U.S.C. § 112 (1954).[10] "[W]here the novelty of the combination * * * is adequately disclosed with definable limitations, other and well-known elements need not be described in structural detail." Bryan v. Sid Richardson, Inc., 254 F.2d 191, 194 (5th Cir.), cert. denied,

---

9. See claims one, two, three and nine, Appendix A.

10. 35 U.S.C. § 112, in part, provides:
"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57 (1958). Having taken advantage of the statute to draw its claims in broad strokes, plaintiff seeks to read the claims on defendant's device without any limitation. The claims are understandable only in terms of the disclosures of the patent. Otherwise, plaintiff's patent would amount to a patent on a result. A function or a result is not patentable. It is the distinctive means for accomplishing the result which is patentable. Westinghouse v. Boyden Power Brakes Co., *supra*; Wheeling Stamping Co. v. Standard Cap & Molding Co., 155 F.2d 6 (4th Cir.), cert. denied, 329 U.S. 764, 67 S.Ct. 125, 91 L.Ed. 658 (1946).

■ The omission from the accused device of any one element of a claim of a combination patent defeats a charge of infringement based on that claim. Bros Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208 (5th Cir. 1965), cert. denied, 383 U.S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852 (1966); Walker, Patents § 461 (Deller ed. 1917). When the claims of the Kay patent are construed in light of the prior art and the specifications of the patent disclosure, it becomes apparent that several elements which are essential to the Kay patent are not present in the accused device. Thus, defeating any contention that the accused device infringes the Kay patent.

Plaintiff's expert admitted that several elements essential to the Kay patent were omitted from the accused device. Defendant's talking books do not infringe any of the relied upon claims in plaintiff's patent in suit because they omit at least one or more of the following elements in plaintiff's claims in issue: (a) a single manual control member to shift the pick-up unit; (b) a single sound track with blank spaces; (c) a circuit breaker or stop means; (d) an index along an outer peripheral edge. Therefore, it must be concluded that the elements in the two structures are substantially different.

In addition, the mode of operation of the defendant's talking book is substantially different from the mode of operation claimed in plaintiff's claims in issue here. In particular, in the Kay patent the pick-up head is biased or moved laterally to a record-engaging position. The selection of a message is accomplished by moving the pick-up head to the desired message. This mode of operation which is an element in all of the claims in issue is not present in the accused device. The mode of operation in the accused device is to rotate the record beneath the stationary needle, thereby selecting the desired message.

■ Therefore, for the reasons stated above, judgment should be entered that the Kay patent in suit (No. 3,086,-297) is valid, but is not infringed by defendant's device.

The Clerk of the Court will notify counsel for defendant to draft an appropriate judgment in accordance with this Memorandum and Order for submission to the Court by September 1, 1970, after first obtaining approval of opposing counsel as to form.

## APPENDIX A

### The Claims in Suit

1. A talking book, comprising a book having on at least some of its pages intelligence reproduced for sensual observation, a sound record with a sound track having recorded thereon for audible reproduction intelligence corresponding to that on the pages of the book, sound reproducing apparatus comprising a pick-up unit for operatively engaging said record, means for moving the record relative to the pick-up unit to reproduce the intelligence thereon audibly, means for engaging and disengaging the pick-up unit with the record, means including a movable control member for shifting said pick-up unit between spaced portions of the sound track without operatively engaging the intermediate portions, so as

to bring said pick-up unit selectively into engagement with different parts of the record, means for supporting said book with one edge of the book adjacent the path of movement of said control member, said book having an index printed along the corresponding edge of at least some pairs of its facing pages, said index having its positional relationship along said edge coordinated with the positional relationship on the record of the intelligence corresponding to that on the pair of pages so that said control member is effective when aligned with said index to place said pick-up unit in operative engagement with the sound track at a point just preceding the recorded intelligence corresponding to that reproduced on said pair of facing pages.

2. A talking book as defined in claim 1, including an index on the control member matching the indexes printed in the book.

3. A talking book comprising a book having on at least some of its pages intelligence reproduced for sensual observation, a sound record with a sound track having recorded thereon for audible reproduction intelligence corresponding to that on the pages of the book, sound reproducing apparatus comprising a pickup unit for operatively engaging said record, means for moving the record relative to the pick-up unit to reproduce the intelligence thereon audibly, manipulative means for engaging and disengaging the pick-up unit with the record to bring said pick-up unit selectively into engagement with different parts of the record respectively corresponding to the pages of the book, a casing for said sound reproducing apparatus including means adapted to support said book in open position on said casing, and means to stop said record at the end of each part.

9. A talking book, comprising a book having on at least some of its pages intelligence reproduced for sensual observation, a second record with a sound track having recorded thereon for audible reproduction intelligence corresponding to that on the pages of the book, the intelligence corresponding to each page being separated by blank portions of the sound track from the intelligence corresponding to the preceding and following pages, sound reproducing apparatus comprising a pick-up unit for operatively engaging said record, means for moving the record relative to the pick-up unit to reproduce the intelligence thereon audibly, means for engaging and disengaging the pick-up unit with the record, means for shifting said pick-up unit between spaced portions of the sound track without operatively engaging the intermediate portions, so as to bring said pick-up unit selectively into engagement with different parts of the record, settable means for operating both said engaging and disengaging means and said shifting means, and a casing for said sound reproducing apparatus including means adapted to support said book with one edge of the book adjacent the path of movement of said settable means, said book having an index printed along the corresponding edge of at least some pairs of its facing pages, said index having its positional relationship along said edge coordinated with the positional relationship on the record of the intelligence corresponding to that on the pair of pages so that settable means is effective when aligned with said index to place said pick-up unit in operative engagement with the sound track in the blank portion preceding the recorded intelligence corresponding to that reproduced on said pair of facing pages and means to simultaneously start said record moving means to reproduce said corresponding recorded intelligence.